## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CHARLES RIVER LABORATORIES, INC.,** ) | |
| ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| vs. ) | **JURY TRIAL DEMANDED** |
| ) | |
| **NADEEM BEG and HUNTINGDON** ) | Case No. |
| **LIFE SCIENCES INC.,** ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Charles River Laboratories, Inc. ("Charles River") avers as follows for its Complaint against Defendants Nadeem Beg ("Beg") and Huntingdon Life Sciences Inc. ("HLS"):

## INTRODUCTION AND NATURE OF THE ACTION

1.      This is an action for preliminary and permanent injunctive relief, damages and other relief arising out of defendant Beg's breach of contract, misappropriation of trade secrets in violation of the Illinois Trade Secrets Act, violation of the Computer Fraud and Abuse Act, violation of the Stored Communications Act and for breach of fiduciary duty, and Defendant Huntingdon's tortious interference with the contractual relationship between Beg and Charles River.

2.      Until recently, Beg was employed by Charles River in a field sales role as an Account Manager. Beg was bound by a Non-Disclosure, Non-Solicitation and Non-Competition Agreement ("Agreement") that imposes a one-year restriction on his post-employment solicitation of Charles River's customers and employees, and on Beg's ability to work for Charles River's competitors.

3.     Shortly before he resigned from Charles River to take the position of Director of Business Development with HLS, a competitor of Charles River, Beg stole extensive confidential and proprietary data from Charles River by downloading data from a confidential database containing confidential information on Charles River's business generally, and its customers and prospective customers specifically, and transferred this information to an external hard drive before deleting the local copies residing on his Charles River-issued computer.

4.     The week before he resigned, Beg engaged in unusual and unauthorized activity with his Charles River email by emailing from his Charles River email account to his personal email account other highly sensitive confidential, proprietary and trade secret information, including global account highlights and requests for proposals.

## PARTIES, JURISDICTION, AND VENUE

5.     Plaintiff is a Delaware corporation registered to do business in the state of Illinois with its principal place of business located at 251 Ballardvale Street, Wilmington, Massachusetts 01187.

6.     Beg is an individual who, Charles River is informed and believes, and thereupon alleges, resides at 40 Copperfield Drive, Hawthorn Woods, Illinois 60047, located in Lake County.

7.     HLS is a Delaware corporation who employs Beg in Illinois, is believed to conduct business in Illinois, but does not appear to be registered to do business in Illinois. Huntingdon's principal place of business is believed to be 100 Mettlers Rd, Millstone, New Jersey, 08873.

8.     The Court has personal and subject matter jurisdiction over this matter under 28 U.S.C. § 1331.  This Court has federal question jurisdiction over this case under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* ("CFAA") 18 U.S.C. § 1030, *et.seq.*, and the

2

Stored Communications Act ("SCA"), 18 U.S.C. §2701 *et seq.*, pursuant to 28 U.S.C. § 1331. The Court also has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. §1367, because those claims are so related to the claims brought under the CFAA and SCA as to form part of the same case or controversy.

9.     Pursuant to 28 U.S.C. § 1391, this action is properly venued in this Court.

## FACTS

### Charles River's Business

10.     Charles River provides a variety of products and services, including pre-clinical and clinical laboratory services to help pharmaceutical and biotechnology companies, government agencies and leading academic institutions around the globe accelerate their research and drug development efforts.

11.     Charles River has facilities in the United States, Canada, Europe and Asia.

### The Development And Retention Of Charles River's Customers

12.     Charles River has invested and will continue to invest considerable resources to develop information, methods and techniques to identify customers, maintain business relationships with customers, learn customers' business needs, develop innovative solutions to market to customers and prospective customers, develop sales strategies and develop and maintain its workforce.

9.     Information regarding potential, current and historical work for Charles River's customers and prospective customers is extremely valuable in Charles River's industry.  By having detailed inside information regarding the volume, patterns, margins and nature of a customer's work, a competitor is able to more effectively – and unfairly – compete for business.

13.     Principal assets of Charles River's business include but are not limited to: financial and sales information, including highly confidential unpublished information regarding

3

revenues, profits, pricing, operating costs and other financial data; business plans, initiatives, programs and strategies; business methods and systems; customer, vendor and employee lists; information regarding customer requirements, preferences and histories; salary, wage and benefits data; business development training materials; and changes in management or policies of Charles River.

14. Within Charles River's industry, such information, methods and techniques are regarded as confidential, proprietary and trade secrets.

15. Charles River considers and treats such information, methods and techniques as trade secrets.

16. Such information, methods and techniques have significant economic value to Charles River, and would be of significant economic value to competitors in the industry.

17. Individuals employed by Charles River in Account Manager positions have access to, and knowledge of, such confidential information, methods and techniques, including access to Saleslogix, Charles River's customer relationship management tool, and Decision Center, a database warehouse which stores detailed financial information.

18. Charles River uses Saleslogix as one of its means to monitor and develop relationships with new and existing customers and to store confidential sales information for all of its existing and prospective customers.

19. Charles River uses Decision Center as one of its means to track detailed financial information, including information regarding the volume, patterns, margins and nature of financial information for specific accounts and projects.

### Charles River's Efforts To Maintain The Confidentiality Of Its Confidential Information

20.     Charles River took steps to safeguard its confidential, proprietary and trade secret information, including various security measures for access to its computers, network (and servers), including unique user account IDs and password protections.

21.     In addition, Charles River limited Beg's and other Account Managers' access to information on Saleslogix by territory, by employing password-protection to Saleslogix, and by user-based authentication with unique IDs to the Decision Center.

<u>Beg's Employment Agreement</u>

22.     Beg commenced employment with Charles River on or about August 11, 1997.

23.     Beg worked for Charles River from Chicago, Illinois, initially as a sales representative selling endotoxin testing in the region encompassing Illinois, Minnesota, Wisconsin, Nebraska, Iowa, Texas, Oklahoma, Missouri and Kansas.

24.     In 2009, Beg began working as an Account Manager selling pre-clinical services ("PCS"), research models and services ("RMS") and discovery services primarily to mid-tier biotech companies as well as to large pharmaceutical companies in the region covering Colorado, Wisconsin, Minnesota, Nebraska, Michigan and the Canadian provinces of Saskatchewan and Manitoba.

25.     Because of the nature of Beg's position, his access to Charles River's highly confidential, proprietary and trade secret information, in exchange for his eligibility in the new sales compensation program, and as a condition to his continued employment, Beg was required to sign an Agreement containing restrictions on the use and disclosure of information and post-employment competition and solicitation.  A true and correct copy of the Agreement between Beg and Charles River is attached hereto as <u>Exhibit 1</u>.

26.     The Agreement provides, in relevant part, with respect to Charles River's Confidential Information:

2. <u>Confidential and Confidential Information.</u>

(a)   You understand and agree that while the protection of confidential information is important to any business, it is of particular importance to the Company's business because of the nature of the Company's business.   You understand and agree that the Company's business involves research models and services, preclinical services, and clinical services, each of which involves confidential research, scientific and/or testing work on confidential projects, and that any unauthorized use or disclosure of Confidential Information, even disclosing the identity of the Company's customers or the nature of the projects on which the Company is working, can cause irreparable harm to the Company and to others.   You understand and agree that the Company's customers entrust the Company with the safekeeping of confidential information concerning their businesses and projects, and that such information is included in and must be treated as Company "Confidential Information" (further defined below).   You agree that the Company's Confidential Information is a valuable, special and unique asset of the Company, access to and knowledge of which are essential to the performance of your duties as an employee of the Company.   It is vital to the Company's legitimate interests that the confidentiality of all Confidential Information is preserved.  Unauthorized disclosure of Confidential Information to anyone outside the Company or use or reliance on the Confidential Information by third parties could result in irreparable harm to the Company.

(b) You agree that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business, operations or financial affairs (collectively, "Confidential Information") is and shall be the exclusive property of the Company.  Confidential Information includes, but is not limited to: trade secrets; product and service information; pricing and cost information; names of contractual agreements between the Company and its customers, suppliers and vendor; inventions; processes; protocols; methods; techniques; projects; facilities information; stud, financial and personnel data; technical know-how; customer, employee, vendor and supplier information; business plans; research and development plans and information; computer programs; animal health, welfare, census and related data and information; and information concerning the equipment, facilities and protocols about the research animals used or to be used by the Company or any customer.  You agree to hold in strict confidence, and not to use, except for the benefit of the Company, or to disclose to any third party without prior written authorization of a corporation officer of the Company, any Confidential Information and such agreement shall remain in effect at all times during the term of your employment and indefinitely thereafter.  Confidential Information does not include any of the foregoing items which has become publicly known and made generally available to the public through no act of yours.

6

(c) You agree that all documents, files, letters, memoranda, reports, records, data, sketches, drawings, laboratory notebooks, program listings, or other written, photographic, or tangible material containing Confidential Information, whether created by you or others, which shall come into your custody or possession, shall be and are the exclusive property of the Company to be used by you only in the performance of your duties for the Company and that you will return all such information, including all copies to the Company immediately upon termination of your employment with the Company for any reason.

(d) You agree that your obligation not to disclose or use Confidential information also extends to similar types of information, know-how, records and tangible property of customers of the Company or suppliers to the Company or other third parties who may have disclosed or entrusted the same to the Company or to you in the course of the Company's business.

(e) . . . . You agree not to copy or store any Confidential Information on any computer, laptop, camera, memory storage device, email account, notebook, diary or other device or mechanism other than those supplied by the Company for use on Company business, without prior written authorization of a corporate officer of the Company . . . .

27. The Agreement provides for restrictions on Beg's post-employment activities, relevant excerpts for which are as follows:

5. Noncompetition and Nonsolicitation. YOU ACKNOWLEDGE AND UNDERSTAND THAT THIS SECTION MAY AFFECT YOUR RIGHT TO ACCEPT EMPLOYMENT WITH OTHER COMPANIES SUBSEQUENT TO EMPLOYMENT BY THE COMPANY. You acknowledge and agree that the Company operates its business in a highly competitive environment, that Company employees must, by the nature of their jobs, have access to Confidential Information and that the Company invests in its employees by making specialized training available to them. Accordingly, as a material inducement for the Company to continue your employment and offer you the new sales compensation program, and in order to protect the Company Confidential Information and good will and to protect employee and customer relations and maintain a stable workforce, you agree that during the time you are employed by the Company and for a period of twelve (12) months after termination of your employment (the "Restricted Period"), you shall not, directly or indirectly, without the prior written consent of the Company:

(a) solicit any business from or interfere with the company's relationship with any customer of the Company, or seek to cause any such customers to refrain from doing business with or patronizing the Company. A customer of the Company shall include any person or entity

which, as of the date of your employment termination or during the twelve (12) months prior to such event, (i) the Company sold goods or services, (ii) the Company had submitted a written proposal for a specific requirement, or (iii) for whom the Company had work in progress; or

(b) within the sales region(s) in which you performed services for the Company, (1) render services as an employee, consultant, director, partner or otherwise to any person, entity, division, subsidiary or subgroup whose primary activity is in competition with any of the Company's businesses, or (2) assist with the creation of (a) any entity whose primary business activity is in competition with any of the Company's businesses, or (b) any division, subsidiary or subgroup of an entity whose primary business activity is in competition with any of the Company's businesses. Nothing herein shall prohibit you from pursuing employment with any corporation or entity engaged substantially in the discovery or development of pharmaceuticals or medicals devices as long as such company also manufactures, markets and sells such products; or

(c) solicit or hire, attempt to solicit or hire, assist another in the solicitation or hiring, or offer consulting or other non-employee arrangements to, any employee of the Company either for your own business or for any other person or entity.

### The Resources And Confidential Information
### Provided By Charles River
### To Beg

28. In his position as Account Manager, Beg had access to Charles River's Confidential Information, as defined in the Agreement, including knowledge about Charles River's financial information, including sales, pricing and discounting Charles River offers to be more competitive in responding to requests for proposals; marketing information, including strategies for positioning Charles River against competitors; and customer information, including related customer communications, proposals and sales histories.

29. Beg also was given access to Charles River's Saleslogix and Decision Center databases as well as reports from Decision Center for the purpose of performing business activities within the scope of his responsibilities at Charles River.

**Beg's Unauthorized Access of Charles River's
Confidential Information
and Abrupt Resignation**

30.     On January 3, 2014, Beg gave Charles River notice of his resignation.

31.     Following his resignation, Charles River wrote to Beg on three separate occasions seeking information regarding his new position to verify his compliance with his Agreement.

32.     Following Beg's abrupt resignation, Charles River engaged a computer forensics company to assist with the review of Beg's Charles River-issued computer.

33.     A post-employment analysis of Beg's Charles River-issued computer revealed that, in the hours before his resignation on January 3, 2014, Beg electronically accessed Charles River's computer databases, including Decision Center and apparently Saleslogix, and accessed a significant number of confidential and proprietary documents and highly sensitive data that contain Charles River's trade secrets.

34.     Beg then attempted to delete many of these files from his Charles River-issued computer, including at least 17 Excel spreadsheets shortly before 1 A.M. on January 3.

35.     The data he accessed between midnight and 2 A.M. on January 3 included spreadsheets apparently derived from Decision Center and/or Saleslogix for:

- Sales by Product Line for his territory;

- Sales by Account Manager and Product Line;

- grp-All Accounts1;

- grp-All Opportunities;

- My Open Opportunities; and

- Contacts in the states of Colorado, Wisconsin, Nebraska, Missouri, Minnesota, Kansas.

36.     On January 2 and January 3, Beg connected a Western Digital Passport external drive to his Charles River-issued computer and apparently loaded many of the files he accessed from Decision Center and Saleslogix upon such drive.   He then appeared to delete some, or all, of those files from his Charles River computer to hide his activity.

37.     The reports accessed by Beg included information outside his territory and business segments he managed while at Charles River and such information was unnecessary for him to perform business activities within the scope of his responsibilities at Charles River.

38.     Further, the data which Beg accessed constituted years' worth of Charles River confidential, proprietary and/or trade secret information on a variety of subjects.   For example, "All Accounts" is believed to contain approximately 15 years' worth of customer and account information.

39.     In an apparent attempt to cover his actions, Beg then deleted local copies of these documents which had resided on his Charles River-issued computer.

40.     Beg also emailed his Outlook contacts of his Charles River-issued account to his personal email account on January 3, 2014.

41.     In addition, Beg emailed from his Charles River-issued email account to his personal email account a significant number of documents containing Charles River's confidential and proprietary documents and highly sensitive data, including:

- December 30, 2013-January 2, 2014 email chain detailing quotes regarding a rat study.

- Global Weekly Highlight Reports for the periods of December 16-22, 2013 and December 23-29, 2013, which show opportunities for all products and services offered world-wide by Charles River, in all territories, as well as contact information and project summaries.

- December 20, 2013 email including a request for proposal from a Charles River customer for animal studies.

- December 19, 2013 email requesting a quote from one of Charles River's key clients for two vaccine studies.

- November 11, 2013 email chain with a contact in Minnesota.

- November 8, 2013 email attaching a proposal for a toxicology study.

42.     One of the emails Beg forwarded to his personal account involved a potential opportunity for two vaccine studies with one of Charles River's key clients that Beg withheld from the appropriate individuals at Charles River and presumably sought to use in order to use such information in his employment with HLS.

43.     Charles River provides remote access to account managers so they do not have any business reason to send Charles River's Confidential Information, as defined in the Agreement, to their personal email accounts.

44.     Beg had no legitimate business reason to forward these documents in the weeks before his resignation of employment, and likely well after he had decided to join HLS, a competitor. Beg was not engaged in any business that warranted his access and use of such documents.

45.     Beg was granted legitimate access to Charles River's Confidential Information, as defined in the Agreement, for "the performance of [his] duties as an employee of the Company" and for the "benefit of the Company" as detailed in the Agreement.    Under the terms of the Confidentiality Agreement, Beg was prohibited from, and exceeded his authority in, accessing, communicating or disclosing to any person or entity, or to use for his benefit or for the benefit of any other person or entity, directly or indirectly, any of Charles River's Trade Secrets or Confidential Information. *See* Ex. 1, p. 1

46.     In addition, Beg was not authorized to copy or store any confidential information on any storage device or email account other than those supplied to him by Charles River for use on Charles River business. *See* Ex. 1, p. 1

47.     Given Charles River's investigation into Beg's conduct remains ongoing, and because it has become apparent that Beg has not returned to Charles River its Confidential Information upon his departure as required by the Agreement, Charles River is unable to tell the extent to which Beg deleted or destroyed information from its computer or network systems that it has been unable to recover.

48.     To date, Charles River has expended in excess of $5,000.00 to investigate the extent of, and nature of, Beg's access to Charles River's computer, database and network systems and Charles River still is incurring such costs.

### Huntingdon Life Sciences Is A Direct
### Competitor To Charles River

49.     On information and belief, Beg is now working for Huntingdon Life Sciences ("HLS") as Director of Business Development, a capacity substantially similar to the responsibilities he performed on behalf of Charles River.

50.     On information and belief, in his position as Director of Business Development, Beg is believed be tasked with identifying new business opportunities for HLS.

51.     On information and belief, HLS is an international contract research organization offering PCS to pharmaceutical, biopharmaceutical, crop protection and chemical companies.

52.     HLS is a competitor of Charles River and competes directly in the area of PCS.

53.     On January 21, 2014, upon learning of Beg's conduct, Charles River sent a letter to Beg, and also wrote to HLS, both via overnight mail, expressing that it believed Beg's work for HLS was a violation of the Agreement and reminding him of his continuing confidentiality

and non-competition obligations under the Agreement. True and correct copies of the January 21, 2014 letters are attached hereto as Exhibit 2.

54.     On January 30, 2014, Charles River sent a second letter to Beg, and also wrote to HLS, reiterating its view that Beg's work for HLS was a violation of the Agreement and that it had previously requested a response by January 27, 2014. Charles River requested a response to this letter by February 3, 2014. True and correct copies of the January 30, 2014 letters are attached hereto as Exhibit 3.

55.     On February 4, 2014, after Beg and HLS again failed to respond and Charles River began uncovering some of Beg's misconduct, Charles River sent Beg and HLS a third letter, putting Beg and HLS on notice that Charles River believed Beg had inappropriately taken confidential Charles River information. True and correct copies of the February 14, 2014 letters are attached hereto as Exhibit 4.

56.     As of the date of this filing, Beg has not responded to the three letters sent by Charles River.

57.     On information and belief, since Beg's resignation, considering Beg's secretive downloading of extensive confidential and proprietary information, and his likely position with HLS, Beg has disclosed, or will disclose, and/or has used, or will use, Charles River's confidential, proprietary and/or trade secrets in the course of his work for HLS or similar company, including those Beg accessed from Charles River's computer and Decision Center systems in the days preceding his abrupt resignation.

**COUNT ONE**
**Breach of Contract**
**Against Beg**

58.     Charles River restates and incorporates by reference all of the previous allegations as if fully rewritten herein.

59.     Beg entered into an Agreement with Charles River, as described above.

60.     Beg has materially breached the Agreement as described above and, specifically, by taking the Confidential Information of Charles River, as that term is defined in the Agreement, without the written consent of Charles River.

61.     Beg has materially breached the Agreement as described above and, specifically, by working for HLS, as described above.

62.     Charles River may learn of additional breaches of contract by Beg during discovery and reserves its rights to recover for any breach of the Agreement by the Defendant.

63.     Beg's breach of the Agreement was and is a substantial factor in directly and proximately causing damages and irreparable harm to Charles River. Charles River has been and continues to be irreparably harmed by Beg's actions.

### COUNT TWO
**Misappropriation of Trade Secrets**
**In Violation of Illinois Trade Secrets Act-765 ILCS 1065/1 *et seq.***
**Against Beg**

64.     Charles River restates and incorporates by reference all of the previous allegations as if fully rewritten herein.

65.     Charles River provided information to Beg during the course of his employment that constitutes a trade secret under the Illinois Trade Secrets Act, 765 ILCS § 1065/2 ("ITSA").

66.     Beg gained access to and learned Charles River's trade secrets in confidence, and was under a contractual duty not to use or disclose Charles River's trade secrets without Charles River's authorization and consent.

67.     Charles River is informed and believes, and thereupon alleges, that Beg misappropriated Charles River's trade secrets by downloading them, by improperly using and disclosing them, and by continuing improperly to use and disclose them, without Charles River's consent or authorization.

14

68. Beg's continued employment by HLS constitutes a threatened misappropriation of trade secrets and/or confidential information.

69. By reason of his wrongful conduct, Beg misappropriated Charles River's trade secrets in violation of ITSA.

70. Charles River is informed and believes, and thereupon alleges, that Beg acted willfully and maliciously.

71. Beg's misappropriation's has caused Charles River to suffer, and will cause it to continue to suffer, substantial, immediate and irreparable harm and damages unless Beg is enjoined from disclosing and using such trade secrets and/or confidential information and from working for HLS. Charles River has been and continues to be irreparably harmed by Beg's actions.

**COUNT THREE**
**Computer Fraud and Abuse Act —Violation of 18 U.S.C. § 1030 *et seq.* ("CFAA")**
**Against Beg**

72. Charles River restates and incorporates by reference all of the previous allegations as if fully rewritten herein.

73. All computers used by Beg to access Charles River's electronically stored information, and/or all computers used by Beg to access, impair or destroy electronic information of Charles River, were at all relevant times computers used in interstate commerce and are protected computers pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e).

74. Charles River's Confidential Information, as defined in the Agreement, and other valuable information are stored on Charles River's protected computers (or servers), to which access is strictly controlled via various security measures, including unique user account IDs and

15

password protections. All relevant Charles River protected computers or servers are used in or affect interstate or foreign communications or commerce.

75. Beg intentionally accessed the secure, protected computers of Charles River without authorization or exceeding his authorization, and thereby obtained information from those protected computers, in violation of 18 U.S.C. § 1030 (a)(2)(c).

76. Upon information and belief, Beg engaged in such misconduct before and after he accepted employment with HLS, and he did so for the benefit of himself and HLS, not Charles River before his resignation.

77. In violation of 18 U.S.C. § 1030(a)(4), Beg knowingly and with intent to defraud, accessed protected Charles River's computers without authorization, or exceeding Beg's authorized access, and in furtherance of the intended fraud obtained valuable Charles River Confidential Information, as defined in the Agreement, or other valuable information having a value exceeding five thousand dollars ($5,0000.00) in a one-year period.

78. Beg knowingly caused the transmission of a code or command, and/or intentionally deleted or destroyed information on the protected computers of Charles River, and as a result, intentionally and without authorization recklessly caused damage and loss to the protected computers of Charles River in violation of 18 U.S.C. § 1030(a) *et seq.*

79. Through his actions in violation of the CFAA, Beg has caused Charles River to incur losses for addressing, responding to and investigating Beg's conduct including in engaging a computer forensic company to conduct a forensic review of Beg's computer, which continues. Such losses exceed $5,000.00 in a one-year period, in violation of 18 U.S.C. § 1030(g) and (c)(4)(A)(i)(I).

80. Beg's violation of the CFAA has caused Charles River to suffer, and will cause it to continue to suffer, substantial, immediate and irreparable harm and damages unless Beg is

16

enjoined from disclosing and using such trade secrets and/or confidential information and from working for HLS and from working for HLS. Charles River has been and continues to be irreparably harmed by Beg's actions.

### COUNT FOUR
**Violation of Stored Communications Act, 18 U.S.C. § 2701 *et seq.* ("SCA")**
**Against Beg**

81. Charles River restates and incorporates by reference all of the previous allegations as if fully rewritten herein.

82. Charles River maintains electronic networks and facilities through which authorized users, for authorized purposes, can utilize electronic communication services, including e-mail.

83. Charles River's e-mail service stores electronic communications in electronic storage incidental to the transmission of the communications and/or for backup purposes.

84. Beg was not authorized to use any electronic communication service of Charles River for purposes other than the legitimate business purposes of, and on the behalf of, Charles River. Any actions of Beg in accessing or using Charles River electronic communications services which were not undertaken for the legitimate business purposes of Plaintiffs were in excess of his authorization to do so.

85. Beg intentionally and without authorization, or in excess of his authorization, accessed Plaintiffs' secure systems, and obtained and/or deleted electronic communications while in electronic storage.

86. Beg's actions in violation of the SCA was willful and intentional.

87. Beg's violation of the SCA has caused Charles River to suffer, and will cause it to continue to suffer, substantial, immediate and irreparable harm and damages unless Beg is enjoined from disclosing and using such trade secrets and/or confidential information and from

working for HLS. Charles River has been and continues to be irreparably harmed by Beg's actions.

## COUNT FIVE
**Breach of Fiduciary Duties**
**Against Beg**

88.     Charles River restates and incorporates by reference all of the previous allegations as if fully rewritten herein.

89.     Beg's actions alleged herein violate the common law of Illinois.

90.     As an Account Manager of Charles River, Beg was entrusted with protecting the best interests of Charles River. Charles River reposed faith, confidence, and trust in Beg's performance of his job responsibilities on behalf of Charles River.

91.     Beg owed certain fiduciary duties to Charles River, including the duty of loyalty.

92.     By accessing Charles River's confidential information for his own use, and/or for the benefit of HLS, Beg abused and betrayed his position with Charles River. Beg further breached his fiduciary duties owed to Charles River by failing to disclose his activities with respect to accessing the Decision Center and connecting an external hard drive in the days preceding his resignation, forwarding e-mail messages and documents to his personal e-mail account, failing to be candid with Charles River regarding his activities, and taking affirmative steps to conceal such improper activity.

93.     Beg further breached his fiduciary duties owed to Charles River by failing to disclose two requests for proposal he received via email dated December 19, 2013 for two toxicology studies from one of Charles River's key customers that was potentially worth several hundred thousand dollars.

94.     By virtue of his employment with HLS, Beg either has disclosed or will inevitably – either intentionally or unintentionally – disclose confidential, proprietary and trade secret

information belonging to Charles River to HLS and, therefore, engage in conduct that violates the trust placed in him by Charles River.

95.     Charles River has been injured by Beg's breaches of fiduciary duty in that Charles River was deprived of the honest services of its employee and lost potential business in an amount to be determined at trial.

96.     Beg's breach of fiduciary duties has caused Charles River to suffer, and will cause it to continue to suffer, substantial, immediate and irreparable harm and damages unless Beg is enjoined from disclosing and using such trade secrets and/or confidential information and from working for HLS. Charles River has been and continues to be irreparably harmed by Beg's actions.

## COUNT SIX
### Tortious Interference with Contract
### Against HLS

97.     Charles River restates and incorporates by reference all of the previous allegations as if fully rewritten herein.

98.     The Agreement reflects a valid contractual relationship between Charles River and Beg.

99.     HLS was aware of Charles River's contractual relationship with Beg, including the restrictive covenants therein.

100.    Defendant HLS is aware that Charles River is the market leader in the PCS segment of the market and that the restrictions in the Agreement would effectively preclude Beg from functioning as a Business Development Director.

101.    Defendant HLS intentionally and without justification interfered with Charles River's contractual relationship with Beg by contracting with him to work for HLS on or before

19

January 3, 2014, while Beg was still employed by Charles River, and/or thereafter inducing Defendant Beg to breach his Agreement with Charles River.

102.    As further proof of HLS's interference, it intends to continue to employ Beg notwithstanding its knowledge of his having unlawfully downloaded Charles River's confidential information on January 3, which conduct directly violates the Agreement between Beg and HLS.

103.    As further proof of HLS's interference, it appears to lack any practical ability to employ Beg as Director of Business Development without breaching the terms of the Agreement between Beg and HLS.

104.    HLS's tortious interference with the contractual relationship between Beg and Charles River has caused Charles River to suffer, and will cause it to continue to suffer, substantial, immediate and irreparable harm and damages unless HLS is enjoined from such interference. Charles River has been and continues to be irreparably harmed by HLS's actions.

### REQUESTS FOR RELIEF

WHEREFORE, Charles River requests that this Court award the following relief:

A.    Enter judgment in favor of Charles River on all Counts in the present Complaint;

B.    Award damages to Charles River in an amount to be determined at trial;

C.    Award Charles River its costs, interest, and reasonable attorneys' fees; and

D.    Issue a preliminary injunction and ultimately, a permanent injunction, as follows:

i.    Beg is prohibited from using or disclosing any confidential information or property of Charles River, including information taken without express authorization from Charles River's premises and computer and systems;

ii.    Beg is prohibited from continuing to work for HLS;

iii.    Beg is required to comply with the terms of his Agreement with

20

Charles River, including the provisions on non-disclosure of confidential information, non-competition and non-solicitation;

        iv.     Beg, HLS and their agents are prohibited from deleting from computer systems or any electronic devices or media in their possession, custody or control any information or documents that pertain, directly or indirectly, to the claims set forth in the Complaint filed by Charles River in this matter, until further order of the Court and forensic copies are made of Beg's work, personal and home computers and any electronic storage devices, including but not limited to his personal computer(s), home computer(s), HLS-issued computer(s) and devices, personal cellular phone(s), and other electronic storage media (*i.e.* USB flash drives, external hard drives, CDs, DVDs, media cards etc.) in their possession, custody or control;

        v.     Beg, HLS and their agents are prohibited from deleting any email from Beg's email account used by Beg, including, but not limited to Beg's personal email account and work email accounts, including used at HLS, until further order of the Court;

        vi.     Beg, HLS and their agents are prohibited from deleting any documents stored in any Cloud storage accounts utilized or maintained by Beg, including at HLS;

        vii.     Beg is required to allow Charles River's designated forensic expert to make forensic copies of any and all electronic devices or media in his possession, custody or control, including but not limited to his personal computer, home computer, personal cellular phone, HLS-issued computer(s) and devices, and other electronic storage media (*i.e.* USB flash drives, external hard drives, CDs, DVDs, media cards etc.). Beg and HLS shall provide Charles River's designated forensic expert with access to all of the aforementioned electronic devices and media within two days of the Order being issued in order for such forensic copies to be

made;

viii.     Beg and HLS are required to allow Charles River's designated forensic expert to make forensic copies of his: (1) personal email account(s) and other email accounts (*e.g.* a shared home email account), including any potentially recoverable deleted email data in his possession, custody or control; (2) any personal Cloud storage account(s) utilized or maintained by Beg; (3) Beg's email account used at work for HLS.  Beg and HLS shall provide Charles River's designated forensic expert with access to all of the aforementioned email accounts and Cloud storage accounts, to the extent such accounts exist, within two days of the Order being issued in order for such forensic copies to be made;

ix.     After the electronic media is forensically preserved as set forth herein, Beg, HLS and their agents are required to return to Charles River all property in their possession that lawfully belongs to Charles River, including, but not limited to, any removable media and backup storage devices containing Charles River information;

x.     The Parties are required to engage in discussions regarding the manner in which a forensic review will be conducted of the computers and electronic storage devices preserved and forensically copied pursuant to this Order.  In the event that the Parties are unable to reach an agreement regarding the protocol for forensic review within five days of the Order being issued, then the Parties should be ordered to submit to the Court their respective proposed versions of the forensic protocol and the Court shall determine the protocol to be followed;

xi.     The forensic copies made pursuant to this Order are to be held in escrow by Charles River's designated forensic expert, pending the Parties' agreement regarding the manner in which a forensic review will be conducted; and

E.     Award Charles River such other relief as this Court deems just and proper.

## JURY DEMAND

Charles River seeks a jury trial on all counts so triable.

Respectfully submitted,

**CHARLES RIVER LABORATORIES, INC.**


_/s/ Conrad S. Kee_
One of Their Attorneys


Conrad S. Kee
Jackson Lewis P.C.
1010 Washington Boulevard, 7th Floor
Stamford, Connecticut 06901
Tel: (203) 961-0404
KeeC@jacksonlewis.com

Peter R. Bulmer
Jackson Lewis P.C.
150 North Michigan Ave.
Suite 2500
Chicago, Illinois 60601
Tel: (312) 787-4949
BulmerP@jacksonlewis.com


4826-3053-2376, v. 7