IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES RIVER LABORATORIES, INC., | ) ) ) ) Case No. 1:14-cv-01170 |
| Plaintiff, | ) ) ) Judge John W. Darrah ) |
| vs. | ) Magistrate Judge Michael T. Mason ) ) |
| NADEEM BEG and HUNTINGDON LIFE SCIENCES, INC., | ) ) ) ) |
| Defendants. | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Thomas F. Hurka
Katherine E. Kenny
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Sixth Floor
Chicago, Illinois 60601
Telephone: (312) 324-1000
Facsimile: (312) 324-1001
thurka@morganlewis.com
kkenny@morganlewis.com
*Counsel for Defendant Huntingdon Life Sciences, Inc.*

Zachary C. Jackson
EPSTEIN BECKER & GREEN, P.C.
150 North Michigan Avenue, 35th Floor
Chicago, Illinois 60601
Telephone: (312) 499-1462
Facsimile: (312) 827-9562
zjackson@ebglaw.com
*Counsel for Defendant Nadeem Beg*

NOW COME Defendants Nadeem Beg ("Mr. Beg") and Huntingdon Life Sciences, Inc. ("Huntingdon") (collectively, "Defendants"), by their respective undersigned attorneys, and for their Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, state as follows:

## I. INTRODUCTION

Through speculation and conclusory statements, Charles River Laboratories, Inc. ("Charles River") attempts to persuade this Court to issue broad, emergency relief in the form of a preliminary injunction against Defendants premised on Mr. Beg's downloading and emailing to himself documents from Charles River, even though he has never accessed that information, Huntingdon has never seen such information, and such information would not give Huntingdon any unfair competitive advantage over Charles River. Charles River seeks such extraordinary relief despite the fact that (1) Mr. Beg was removed from his position by Huntingdon and has not worked since February 21, 2014; (2) Defendants have turned over all computers and devices that conceivably could contain any Charles River documents to a third-party forensic firm selected by Charles River for deletion, with Huntingdon agreeing to pay half the cost; (3) Huntingdon has turned over nearly all documents and information requested by Charles River through informal discovery; and (4) the forensic analysis to date is consistent with Mr. Beg's representation that during his short tenure working at Huntingdon, he never opened or accessed a single Charles River document, and he certainly did not use any such documents to solicit customers. Simply stated, Charles River cannot muster any facts sufficient to demonstrate that a preliminary injunction of any kind is warranted against Defendants, let alone one enjoining Mr. Beg from working for Huntingdon or any other Charles River competitor or otherwise earning a living.

## II. FACTUAL BACKGROUND

Huntingdon is an international contract research organization offering pre-clinical

1

services to pharmaceutical, biopharmaceutical, crop protection and chemical companies. *See* Declaration of David Grewcock ("Grewcock Decl.") ¶ 2, attached as Exhibit A. In late summer 2013, Huntingdon began recruiting for a sales person through a third-party recruiter. *Id.* ¶ 3. Mr. Beg, an employee of Charles River, was introduced to Huntingdon by that recruiter. Declaration of Nadeem Beg ("Beg Decl.") ¶¶ 1, 3, attached as Exhibit B. In December 2013, Huntingdon offered Mr. Beg the position of Director, Business Development, with responsibility over various states primarily in the U.S. Midwest and portions of Canada. *Id.* ¶ 3; Grewcock Decl. ¶ 3. Mr. Beg accepted the offer and began working for Huntingdon on January 6, 2014. *Id.* Unbeknownst to Huntingdon, prior to Mr. Beg's resignation he downloaded and emailed to himself documents, as nothing more than a security blanket, because in reality that information would not provide Huntingdon any competitive advantage. Beg Decl. ¶ 4. Huntingdon did not request that Mr. Beg bring with him any information or documents from Charles River. *Id*; Grewcock Decl ¶ 6. After attending orientation at Huntingdon, Mr. Beg began doing his job, identifying prospective clients for Huntingdon and contacting people in an effort to set up meetings to discuss Huntingdon's capabilities. Beg Decl. ¶ 3.

On February 19, 2014, Charles River filed suit against Defendants. In an effort to resolve this matter, and in a demonstration of good faith, on February 21, 2014, two days after Charles River served the Complaint, Huntingdon voluntarily decided to temporarily remove Mr. Beg from his position, instructed him to cease performing any work and cut off access to his Huntingdon email account and its systems. Beg Decl. ¶ 5; Grewcock Decl. ¶ 4. Mr. Beg has not worked for Huntingdon since February 21, 2014. *Id.* Additionally, Defendants have turned over all computers and devices that conceivably could contain any Charles River documents to a third-party forensic firm, including the Huntingdon laptop that was assigned to Mr. Beg. Beg

Decl. ¶ 6; Grewcock Decl. ¶ 8. Further, Huntingdon agreed to pay one-half of the forensics firm's fees. Grewcock Decl. ¶ 8. Finally, Huntingdon has turned over nearly all the documents and information requested by Charles River pursuant to the Court's order directing the parties to exchange information to facilitate settlement discussions. *Id.* ¶ 10.

## III. ARGUMENT

### A. Charles River Is Not Entitled To A Preliminary Injunction Against Defendants.

#### 1. The Standard For Obtaining A Preliminary Injunction Is A Rigorous One, And Charles River Cannot Meet That Standard.

Charles River's Complaint seeks broad, emergency relief against Defendants in this case, but offers little more than speculation and suspicion in an attempt to justify its requests for such extreme relief. "An equitable, interlocutory form of relief, a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008). Thus, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts*, 549 F.3d at 1085-86. To survive the threshold phase, a party seeking injunctive relief must demonstrate "(1) a likelihood of success on the merits; (2) a lack of adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted." *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 705 (N.D. Ill. 2011).

"If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction." *Girl Scouts of Manitou Council*, 549 F.3d at 1086 (citing *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). If,

3

however, the court finds that the moving party has passed this initial threshold, it then proceeds to the balancing phase in which "the Court must balance the threatened injury to the moving party with the threatened harm the injunctive relief may inflict on the non-moving party." *Huawei Techs. Co., Ltd. v. Motorola, Inc.*, No. 1:11-cv-497, 2011 WL 589697, at *2 (N.D. Ill. Feb. 10, 2011). The Court must also consider the interests of nonparties, including "the public interest." *Girl Scouts of Manitou Council*, 549 F.3d at 1086. The Court "must exercise its discretion to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id.* (citation omitted).

As argued more fully herein, Charles River cannot establish any of the elements entitling it to the extreme remedy of a preliminary injunction against Defendants. Accordingly, Charles River's Motion should be denied.

**B.     Charles River Cannot Demonstrate That It Has Suffered, Or Will Suffer, Irreparable Harm Without The Protection Of A Preliminary Injunction, And That There Is No Adequate Remedy At Law For Any Such Injury.**

**1.     Charles River Cannot Demonstrate Past Harm, And Cannot Demonstrate Likely Future Harm Should A Preliminary Injunction Not Be Entered.**

One of the prerequisites for the extraordinary remedy of injunctive relief is that a plaintiff will suffer irreparable harm if the injunction is not granted. *Winter*, 555 U.S. at 23. An injury is not irreparable where the party seeking the temporary injunction has an adequate remedy at law and can be compensated by an award of money damages. *See Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). A party seeking an injunction must plead facts which clearly establish that he is likely to suffer irreparable harm in its absence; allegations based merely on a possibility of harm or mere speculation are not enough. *See Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 780 (N.D. Ill. 2011) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with the Court's

4

repeated characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

Charles River cannot demonstrate that it will suffer irreparable harm and instead relies solely on its belief of potential and wholly undefined future injury. Charles River is operating under the unsupported premise that Mr. Beg usurped two corporate opportunities – neither of which was presented to Huntingdon – and that as a result, Charles River lost profits from requests for proposals from two different customers that were not disclosed by Mr. Beg to Charles River prior to his departure. (Plaintiff's Memorandum of Law in Support of Preliminary Injunction "Memo." 3.) As previously disclosed to Charles River, Mr. Beg has not usurped any opportunities, and he certainly has not presented Huntingdon with any requests for proposal from Charles River clients or any potential clients either prior to or during his short tenure with the Company. Grewcock Decl. ¶ 5. Furthermore, Huntingdon confirmed to Charles River that it received *none* of Charles River's confidential information, and that Mr. Beg confirmed turning over all Charles River information to the forensics firm engaged by Charles River. *Id.* ¶ 9. Even after forensic analysis of all computers and devices that conceivably could contain any Charles River documents, Charles River has failed to identify any instance of *use or transmission* of Charles River's alleged confidential information.

Knowing this reality, Charles River falls back on an unspecified threat-of-harm and inevitable disclosure theory. (Memo. 13.) Yet, as discussed more fully in § III.C.2 *infra*, the doctrine of inevitable disclosure is inapplicable here. Even if there were some risk of inevitable disclosure, any alleged confidential information that Mr. Beg acquired from Charles River regarding pricing or testing is without value given that when Huntingdon competes for a request for proposal ("RFP") the other competitors typically are unknown, pricing is catered to each

proposal, and every pre-clinical laboratory proposal has unique requirements. *See* Grewcock Decl. ¶ 7. As such, Mr. Beg's value to Huntingdon is his credibility and general reputation in the industry and his good skills as a salesperson, not any confidential information regarding pricing or testing that he may have from his prior employment at Charles River. *See id.* With this complete dearth of evidence, Charles River can make no showing of irreparable harm.

### 2. The Injunctive Relief Sought Is Unwarranted As There Are No Facts Supporting Such Relief.

Charles River seeks injunctive relief that will enjoin Defendants from accessing, reviewing, or utilizing any of Charles River's confidential information, and bar Mr. Beg from employment with Huntingdon. (Memo. 1.) Charles River also "requests an order requiring Defendants to (i) return copies of Charles River's confidential information, and (ii) submit to forensic examination of their computer systems and devices to identify and retrieve any confidential information belonging to Charles River." (*Id.*) As a threshold matter, most of the injunctive relief requested by Charles River is moot, as Defendants have already turned over all computers and devices that conceivably could contain any Charles River documents for review and deletion of all such documents. Beg Decl. ¶ 6; Grewcock Decl. ¶¶ 8-10. Also, Huntingdon agreed to pay one-half of the forensics firm's fees incurred in identifying and deleting any and all Charles River documents from the computers and devices. Finally, Huntingdon has turned over nearly all of the documents and information requested by Charles River through informal discovery. Grewcock Decl. ¶ 10. Given these facts, much of the injunctive relief sought by Charles River is unnecessary and unwarranted.

Furthermore, Charles River cannot marshal any evidence to demonstrate that Defendants have engaged in the conduct it now seeks to bar by means of injunctive relief. Huntingdon has never had, and does not have, any Charles River confidential information or trade secrets;

6

Mr. Beg has turned over all computers and devices that potentially contain Charles River documents and information and agreed to their deletion; and Mr. Beg has not accessed or otherwise used Charles River's confidential information or trade secrets, let alone used them to solicit or do business with Charles River's current or potential customers on behalf of Huntingdon. *See* Beg Decl. ¶ 7. Therefore, the request for injunctive relief should be denied.

    **C.**    **Charles River Cannot Demonstrate A Likelihood Of Success On The Merits Of Its Claims Against Defendants.[1]**

        **1.**    **Charles River Cannot Demonstrate A Likelihood Of Success On The Merits Of Its Breach Of Contract Claim Because The Restrictive Covenants Are Unenforceable, And There Is No Ongoing Breach Of The Confidentiality Provision.**

Charles River alleges that Mr. Beg breached his Non-Disclosure, Non-Solicitation, and Non-Competition Agreement ("Agreement"). To succeed on a breach of contract claim in Massachusetts, Charles River must show the existence of a contract, that a breach occurred, and that Charles River suffered damages as a result of the breach. *See, e.g., Michelson v. Digital Financial Services,* 167 F.3d 715, 720 (1st Cir. 1999). In Massachusetts, a restrictive covenant is enforceable only if it "is necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with public interest." *Oxford Global Resources, Inc. v. Guerriero,* No. 03-12078-DPW, 2003 WL 23112398, at *6 (D. Mass. Dec. 30, 2003). Legitimate business interests that can support a restrictive covenant include trade secrets, other confidential information, and employer goodwill. *Exeter Group, Inc. v. Sivan,* No. 20050628BLS2, 2005 WL 1477735, at *4 (Mass. Super. March 25, 2005). However, protection from "ordinary competition" is not a legitimate business interest. *Id.*

---

[1] Consistent with Charles River's Motion for Preliminary Injunction (Memo. §§ IV(A)(1)-(4)), Defendants limit their arguments to the same claims addressed by Charles River, though Defendants can establish that Charles River fails to demonstrate a likelihood of success on the merits of its remaining legal claims as well.

Charles River cannot demonstrate that the restrictive covenants contained in the Agreement are enforceable, as they are not necessary to protect Charles River's alleged goodwill. To obtain an injunction to protect goodwill, the employer must show the existence of goodwill, and that the employee being restrained is in a position to harm that goodwill. *William Gallagher Assocs. Ins. Brokers v. Everts*, 13 Mass L. Rptr. 716, 2001 WL 1334763, at *8 (Mass. Super. Sept. 6, 2001). Charles River cannot realistically claim it has a protectable goodwill interest, as it does not hold exclusive contracts with those entities Charles River claims Mr. Beg has contacted and from which he has allegedly solicited business in breach of the Agreement. *See* Grewcock Decl. ¶ 7; *see, e.g., Exeter Group, Inc.*, 2005 WL 1477735, at *5 (denying injunction; finding in part, former employee was not soliciting a shared customer when she worked for competitor but was "simply continuing a long-term ongoing [business] relationship"). Additionally, as to customers with whom Mr. Beg does not have close relationships, Charles River cannot establish that Mr. Beg is in any position to damage its goodwill with those customers. *See Oxford Global Resources, Inc.*, 2003 WL 23112398, at *7 (stating if the employee was "not in a position . . . to develop close relationships with a wide range of [the employer's] customers or suppliers, then the employer's goodwill is not at risk").

Nor can Charles River present any evidence to show that the restrictive covenants contained in the Agreement are necessary to protect Charles River's trade secrets or confidential information. Mr. Beg has not retained any Charles River information, let alone trade secrets or confidential information, as Mr. Beg voluntarily turned over all computers and devices that conceivably could contain any Charles River documents for review and deletion of all such documents. Because Mr. Beg either did not take, or has returned all Charles River documents, he is in no position to use trade secrets or confidential information to harm Charles River. *See*

8

*Exeter Group, Inc.*, 2005 WL 1477735, at *5 (denying injunction; finding that although the former employee e-mailed company documents to her personal account, "there is no evidence that she did share them with her new employer"); *FLEXcon Co., Inc. v. McSherry*, 123 F. Supp. 2d 42, 43 (D. Mass. 2000) (denying injunction and distinguishing high level executive from manager-employee who was not involved in the "inner sanctum of running the corporation"). Thus, Charles River cannot rely on its confidential or proprietary documents to support an injunction premised on the restrictive covenants in the Agreement. Similarly, because Mr. Beg no longer has any Charles River documents or information, and Huntingdon never had any such documents or information, Charles River cannot allege that Mr. Beg continues to violate the confidentiality provision of his Agreement, and injunctive relief is unwarranted.

Finally, granting a preliminary injunction to enforce the non-compete provision is against the public interest.[2] The public has an interest in allowing an individual to freely practice his trade and/or occupation. *Oxford Global Resources, Inc.*, 2003 WL 23112398, at *10. Perhaps more importantly, for those clients with whom Mr. Beg has established relationships, they have an interest in continuing that relationship regardless of Mr. Beg's change in employment. *See BNY Mellon, N.A v. Schauer.*, 27 Mass. L. Rptr. 329, 2010 WL 3326965, at *8 (Mass. Super. May 14, 2010). Because Charles River cannot demonstrate Mr. Beg retained any confidential documents or information, he is not in a position to damage Charles River's goodwill, and a preliminary injunction would conflict squarely with public policy; Charles River's motion should be denied.

---

[2] Mere days ago, on April 10, 2014, Massachusetts Governor Deval Patrick announced a proposed bill that would prohibit non-compete agreements in Massachusetts as part of an effort to stimulate job growth. *See* http://www.mass.gov/governor/pressoffice/pressreleases/2014/0410-governor-patrick-announces-economic-development-package.html, last checked April 13, 2014. Thus, while Massachusetts law currently permits non-compete agreements in limited circumstances, these types of agreements are readily losing public support and may be prohibited entirely. *Id.*

### 2. Charles River Cannot Demonstrate A Likelihood Of Success On The Merits Of Its Misappropriation Of Trade Secrets Claim.

Charles River cannot demonstrate a likelihood of success on the merits of its claim of misappropriation of trade secrets under the Illinois Trade Secret Act ("ILTSA"), 765 ILCS 1065/1 *et seq*. Demonstrating the weakness of its claim, Charles River nowhere identifies a single trade secret that Mr. Beg allegedly absconded with, used or disclosed after joining Huntingdon. A party seeking the extraordinary relief of a preliminary injunction premised on a misappropriation of trade secrets claim must identify with particularity, or provide copies (redacted or filed under seal) of the trade secrets at issue and sufficient information to support such a serious claim. *See Teradyne, Inc. v. Clear Commc'ns Corp.*, 707 F. Supp. 353, 357 (N.D. Ill. 1989) (dismissing ILTSA claim, stating "All that is alleged . . . is that defendants could misuse plaintiff's secrets, and plaintiffs fear they will. This is not enough."). Therefore, mere conclusory language like that used by Charles River does not suffice. (*See* Memo. 8 ("[T]he information Mr. Beg accessed and downloaded included trade secrets such as customer lists containing confidential financial information and documents of prior interactions, and sales data by account manager and product line.")).

Furthermore, the inevitable disclosure doctrine on which Charles River necessarily premises its argument (Memo. 9)[3] was not intended to be applied to rank and file sales employees like Mr. Beg that possess no proprietary information. *See Fisher/Unitech, Inc. v. Computer Aided Technology, Inc.*, No. 13 C 02090, 2013 WL 1446425, at *5-6 (N.D. Ill. April 9, 2013) (denying injunction and refusing to apply the inevitable disclosure doctrine against a

---

[3] As discussed *supra* § II Huntingdon and Mr. Beg have turned over all computers and devices that conceivably could contain any Charles River documents for review and deletion of all such documents. As such, Charles River cannot plausibly argue that Mr. Beg is still in possession of any of the documents he allegedly took from Charles River.

salesman possessing general knowledge and skills any sales representative in the industry would have); *compare with PepsiCo v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (high ranking executive had access to strategy and analysis of PepsiCo operations, warranting an injunction).

The case law analyzing the doctrine of inevitable disclosure reinforces sound public policy that the law is hostile towards restrictions on trade and commerce. *See Océ N. Am., Inc. v. Brazeau*, No. 09 C 2381, 2009 WL 6056775, at *10 (N.D. Ill. Sept. 4, 2009) ("[C]ourts do not often invoke the "inevitable disclosure" doctrine because a broad application would be an effective bar against employees taking similar positions with competitive entities."). Based on the lack of facts supporting a claim for inevitable disclosure, there is no likelihood that Charles River will succeed on its misappropriation of trade secrets claim and, therefore, a preliminary injunction is unwarranted.

### 3. Charles River Cannot Style The Copying Of Information As A Violation Of The Computer Fraud And Abuse Act.

Charles River's claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* ("CFAA") is essentially predicated on Mr. Beg accessing Charles River's computer databases and email system while an employee and then attempting to delete locally the documents and emails he accessed from his Charles River computer. (Complaint ¶¶ 78-78; Memo. 10-11.) Here, Charles River has done what plaintiffs often do in an effort to get into federal court – retrofit their taking of confidential information allegations into a CFAA violation. This Court does not condone such efforts. *See Triteq Lock & Sec. LLC v. Innovative Secured Solutions, LLC*, No. 10-cv-01304, 2012 WL 394229, at *5 (N.D. Ill. Feb. 1, 2012) (describing the limited applicability of the CFAA– "a conveniently available federal statute").

The CFAA is traditionally a criminal statute, but it allows a private right of action in the limited circumstance where a plaintiff can show that it suffered damage and loss. *Farmers Ins.*

*Exchange v. The Auto Club Group*, 823 F. Supp. 2d 847, 852 (N.D. Ill. 2011) (dismissing CFAA claim alleging the mere accessing of confidential information).[4] Likely recognizing the fact that accessing computer databases and emails or misappropriating information is insufficient to establish CFAA damages,[5] Plaintiff alleges that Mr. Beg attempted to delete the documents and emails he accessed from his Charles River computer. *See* Complaint ¶ 78. Charles River, however, ignores the damage requirement of CFAA that "there must be destruction or impairment to the integrity of the *underlying data*." *See Del Monte*, 616 F. Supp. 2d at 811 (emphasis added); *Saban*, 780 F. Supp. 2d at 736 (finding no likelihood of success of a CFAA claim when defendant permanently erased personal files from work computer but did not compromise any of the employer's underlying data). Charles River alleges that Mr. Beg attempted to delete documents from his Charles River computer, but not the *underlying data*, *i.e.*, the original documents that were saved to Charles River's database. *See* Complaint ¶¶ 33-37. Thus, there was no disturbance in the integrity of Charles River's underlying data.

Charles River also attempts to style its allegations concerning its investigation and forensic damages assessment into the definition of a CFAA "loss."[6] However, Charles River

---

[4] "Damage" is "any impairment to the integrity or availability of data, a program, a system, or information." *Farmers Ins. Exchange*, 823 F. Supp. 2d at 852. "Loss" is "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense. . ." *Id.* at 853-54.

[5] *See Triteq Lock*, 2012 WL 394229, at *6-7 (dismissing CFAA claim brought in a trade secrets case for failure of adequate damage and loss allegations); *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F. Supp. 2d 805, 811 (N.D. Ill. 2009) ("copying electronic files from a computer database—even when the ex-employee e-mails those files to a competitor—is not enough to satisfy the damage requirement of the CFAA."); *Garelli Wong & Assocs. v. Nichols*, 551 F. Supp. 2d 704, 710 (N.D. Ill. 2008) ("Though [plaintiff] would like us to believe that recent amendments to the CFAA are intended to expand the use of the CFAA to cases where a trade secret has been misappropriated through the use of a computer, we do not believe that such conduct alone can show 'impairment to the integrity or availability of data, a program, a system, or information.'").

[6] Charles River cannot prove "loss" without any damage to its systems. *See Triteq Lock*, 2012 WL 394229, at *7 (finding that "loss" refers to: "(1) the cost of investigating or repairing a computer or computer system following a violation that caused damage to a computer or computer system, or (2)

ignores the equally clear case law on this too –"[j]ust because [plaintiff] alleges it paid for a 'damage assessment' does not make it so." *Del Monte*, 616 F. Supp. 2d at 812. As Charles River's Complaint demonstrates at Paragraphs 32-33 and Exhibit 4, Charles River was conducting a pre-litigation investigation. While utilizing forensics for such an investigation "is certainly a legitimate business concern, it does not transform any harms allegedly suffered by [plaintiffs] into 'losses' under the CFAA." *Mintel Int'l Group, Ltd. v. Neergheen*, No. 08 C 3939, 2010 WL 145786, at *10 (N.D. Ill. Jan. 12, 2010); *Del Monte*, 616 F. Supp. 2d at 812 ("Del Monte was not concerned about the integrity of its data . . . It appears Del Monte hired Holleb for assistance in its lawsuit against Kinnavy and Chiquita, not to conduct a damage assessment."). Charles River was certainly entitled to conduct its forensic investigation, but it cannot fit that round peg into the square hole of a CFAA claim. *See Triteq Lock*, 2012 WL 394229, at *7 ("Congress was concerned with . . . attacks by virus and worm writers, on the one hand, which come mainly from the outside, and attacks by disgruntled employees who decide to trash the employer's data on the way out (or threaten to do so in order to extort payments), on the other.") (internal citations and quotations omitted). Therefore, Charles River cannot establish a substantial likelihood of success on the merits of its CFAA claim. Further, even if Charles River somehow could muster facts to support a CFAA claim, there is no allegation of any ongoing violation or irreparable harm sufficient to warrant injunctive relief.

### 4. Huntingdon Has Not Tortiously Interfered With A Valid Contract.

To succeed on a claim for tortious interference under Illinois law, Charles River must allege: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified

---

revenue lost, cost incurred, or other consequential damages incurred because of the interruption of service.").

inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *Hess v. Kanoski & Associates*, 668 F.3d 446, 454 (7th Cir. 2012) *reh'g denied*, (Mar. 19, 2012) (internal citations omitted). Charles River cannot show that it has any likelihood of succeeding on the merits of its tortious interference with a contract claim. First, Charles River's tortious interference claim fails because as discussed *supra* § III.C.1 the restrictive covenants that form the basis for its breach of contract claim are unenforceable. *See Hess*, 668 F.3d at 454 (to succeed on a claim of tortious interference a party must first show "the existence of a valid and enforceable contract between the plaintiff and another..."). Second, Charles River cannot show that Huntingdon intentionally and unjustifiably induced Mr. Beg to breach the Agreement, because the restrictive covenants are unenforceable. Third, as to the confidentiality provisions of the Agreement, Huntingdon never requested that Mr. Beg bring with him to Huntingdon any information or documents from Charles River, nor did Huntingdon encourage Mr. Beg to disclose Charles River's allegedly confidential information. (Memo. 12.) And, Mr. Beg never did so. Fourth, neither Huntingdon nor Mr. Beg used any of the Charles River confidential information to solicit Charles River customers. Therefore, Charles River cannot demonstrate a likelihood of success on its tortious interference claim against Huntingdon (the sole claim against Huntingdon), and injunctive relief is unwarranted.

### D.   A Balancing Of Harms Compels Denial Of Charles River's Motion.

In order to grant injunctive relief, the Court must find that the threatened injury to the plaintiff outweighs the harm the injunction may inflict on the defendant, and that the injunction will not disserve the public interest. *See McDermott Inc. v. Wheelabrator-Frye, Inc.*, 649 F.2d 489, 492 (7th Cir. 1980). Charles River gives short shrift to the balancing of harms in this case, arguing only that it need not prove much because of its erroneous perception of the strength of

Charles River's likelihood of success and conclusion that Mr. Beg and Huntingdon's harm would be limited to the loss of Mr. Beg's services. (*See* Memo. 15.) Charles River's harm is negligible, at best. There has been no allegation, nor will there be any evidence, that Charles River is suffering any irreparable harm or that Mr. Beg or Huntingdon have misused Charles River's alleged confidential information. Nor has Charles River explained what unfair advantage Huntingdon will have over it absent an injunction. On the other hand, if the Court were to grant the requested injunctive relief, it would have devastating financial consequences for Mr. Beg. Mr. Beg is not a highly compensated executive, but a rank and file sales employee, who is the primary wage earner for his family, including four children. *See* Beg Decl. ¶ 2. Understandably, Mr. Beg must work to provide for his family, and granting Charles River's preliminary injunction would effectively prohibit him from working in the only industry he has known for twenty-three years. Meanwhile, Huntingdon would be forced to undertake its job search–most likely utilizing a costly recruiting firm–all over again. Grewcock Decl. ¶ 11; *see Applied Industrial Materials Corp. v. Brantjes*, 891 F. Supp. 432, 439 (N.D. Ill. 1994) ("injunction should not go beyond the need to protect the legitimate interests of the plaintiff and should not unduly burden the defendant"). Finally, the public interest warrants denial of injunctive relief in this case given that an injunction in this case would have a chilling effect on the free movement of employees, regardless of whether they are subject to an enforceable non-competition or non-solicitation agreement. Therefore, Charles River's request for a preliminary injunction should be denied.

## IV.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiff's Motion for Preliminary Injunction and grant Defendants any and all appropriate relief.

April 15, 2014                    Respectfully submitted,

/s/ Katherine E. Kenny
Thomas F. Hurka
Katherine E. Kenny
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 324-1000
Facsimile: (312) 324-1001
thurka@morganlewis.com
kkenny@morganlewis.com

*Attorneys for Defendant Huntingdon Life Sciences, Inc.*

/s/ Zachary C. Jackson

Zachary C. Jackson
Epstein Becker & Green, P.C.
150 North Michigan Avenue
35th Floor
Chicago, Illinois 60601
Telephone: (312) 499-1462
Facsimile: (312) 827-9562
zjackson@ebglaw.com

*Attorney for Defendant Nadeem Beg*

# CERTIFICATE OF SERVICE

I, Katherine E. Kenny, hereby state that on April 15, 2014, I filed a true and correct copy of the above and foregoing Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction via the Clerk's CM/ECF system, which caused a copy of the same to be served upon the following counsel of record for Plaintiff:

>Peter R. Bulmer
>Jackson Lewis P.C.
>150 North Michigan Avenue, Suite 2500
>Chicago, Illinois 60601
>
>Conrad S. Kee
>Jackson Lewis P.C.
>1010 Washington Boulevard, 7th Floor
>Stamford, Connecticut 06901

>/s/ Katherine E. Kenny
>Katherine E. Kenny