# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CHARLES RIVER LABORATORIES, INC., | ) ) ) |
| | ) **Case No. 1:14-cv-01170** |
| Plaintiff, | ) |
| | ) **Judge John W. Darrah** |
| vs. | ) **Magistrate Judge Michael T. Mason** |
| | ) |
| | ) |
| NADEEM BEG and HUNTINGDON LIFE SCIENCES, INC., | ) ) |
| | ) |
| Defendants. | ) |

## <u>DEFENDANTS' POST-HEARING BRIEF</u>

Thomas F. Hurka
Katherine E. Kenny
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Sixth Floor
Chicago, Illinois 60601
Telephone: (312) 324-1000
Facsimile: (312) 324-1001
thurka@morganlewis.com
kkenny@morganlewis.com
*Counsel for Defendant Huntingdon Life Sciences, Inc.*

Zachary C. Jackson
EPSTEIN BECKER & GREEN, P.C.
150 North Michigan Avenue, 35th Floor
Chicago, Illinois 60601
Telephone: (312) 499-1462
Facsimile: (312) 827-9562
zjackson@ebglaw.com
*Counsel for Defendant Nadeem Beg*

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ........................................................................................................1

II.  FACTUAL BACKGROUND .......................................................................................2

III.  ARGUMENT ................................................................................................................3

    A.  The Standard For Obtaining A Preliminary Injunction Is A Rigorous One, And Charles River Has Failed To Meet That Standard.............................................3

    B.  Charles River Failed To Demonstrate That It Has Suffered, Or Will Suffer, Irreparable Harm Without The Protection Of A Preliminary Injunction And That There Is No Adequate Remedy At Law For Any Such Injury ....................................................................................................................4

        1.  Charles River Failed To Demonstrate Past Harm, And Cannot Demonstrate Likely Future Harm Should A Preliminary Injunction Not Be Entered ........................................................................................4

            a.  Charles River Failed To Demonstrate That Mr. Beg Usurped Any Corporate Opportunities..........................................5

            b.  Charles River Failed To Demonstrate That Mr. Beg's Efforts To Prospect Existing Huntingdon Clients Has Caused, Or Will Cause, Irreparable Harm To Charles River ........7

            c.  Mr. Beg Never Accessed, Used Or Transmitted Any Confidential Charles River Information, And Neither Mr. Beg Nor Huntingdon Is In Possession Of Any Such Information ................................................................................7

    C.  Charles River Failed To Demonstrate A Likelihood Of Success On The Merits Of The Applicable Claims Against Defendants.........................................8

        1.  Charles River Failed To Demonstrate A Likelihood Of Success On The Merits Of Its Breach Of Contract Claim Because The Restrictive Covenants Are Unenforceable ................................................8

            a.  The Non-Solicitation And Non-Competition Provisions Of The Agreement Are Not Enforceable Because They Are Unreasonably Overly Broad .............................................9

            b.  Charles River Has Failed To Establish That The Restrictive Covenants Are Enforceable Because The Information Mr. Beg Copied Is Not Confidential ...................................................11

            c.  Charles River Has Failed To Demonstrate That The Restrictive Covenants Are Enforceable, As They Are Not Necessary To Protect Charles River's Alleged Goodwill ...........12

            d.  The Restrictive Covenants Should Not Be Enforced As They Are Against Public Interest ................................................13

2.    Charles River Failed To Demonstrate A Likelihood Of Success On The Merits Of Its Claim That Mr. Beg Breached The Confidentiality Provision Of The Agreement ..........................................14

3.    Charles River Failed To Demonstrate A Likelihood Of Success On The Merits Of Its Misappropriation Of Trade Secrets Claim...................15

4.    Charles River Cannot Style The Copying Of Information As A Violation Of The Computer Fraud And Abuse Act, And Such Claim Does Not Support Injunctive Relief ............................................17

5.    Huntingdon Has Not Tortiously Interfered With A Valid Contract.........17

D.    A Balancing Of Harms Compels Denial Of Charles River's Motion .................18

IV.    CONCLUSION ..........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All Stainless, Inc. v. Colby,*
   308 N.E. 2d 481 (Mass. 1974)......................................................................9, 10

*Applied Indus. Materials Corp. v. Brantjes,*
   891 F. Supp. 432 (N.D. Ill. 1994)......................................................................20

*Boucher v. Sch. Bd. of Sch. Dist. of Greenfield,*
   134 F.3d 821 (7th Cir. 1998)......................................................................4

*Chiswick, Inc. v. Constatas,*
   No. 200400311, 2004 WL 1895044 (Mass. Super. June 17, 2004)............................11, 13, 19

*Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.,*
   616 F. Supp. 2d 805 (N.D. Ill. 2009)......................................................................17

*Exeter Grp., Inc. v. Sivan,*
   No. 20050628BLS2, 2005 WL 1477735 (Mass. Super. Mar. 24, 2005)................9, 12, 14, 15

*Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.,*
   968 F.2d 1463 (1st Cir. 1992)......................................................................11

*Garber Bros., Inc. v. Evlek,*
   122 F. Supp. 2d 375 (E.D.N.Y. 2000)......................................................................9

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,*
   549 F.3d 1079 (7th Cir. 2008)......................................................................3, 4

*Hamburger v. Hamburger,*
   No. 93-3359, 1995 WL 5799679 (Mass Super. Sept. 29, 1995)......................................12

*Harlan Labs., Inc. v. Campbell,*
   900 F. Supp. 2d 99 (D. Mass. 2012)......................................................................14

*Hess v. Kanoski & Assocs.,*
   668 F.3d 446 (7th Cir. 2012)......................................................................18

*Huawei Techs. Co. v. Motorola, Inc.,*
   No. 11-497, 2011 WL 589697 (N.D. Ill. Feb. 10, 2011)......................................................4

*McDermott Inc. v. Wheelabrator-Frye, Inc.,*
   649 F.2d 489 (7th Cir. 1980)......................................................................18, 19

*Michelson v. Digital Fin. Servs.*,
    167 F.3d 715 (1st Cir. 1999) ........................................................................... 8

*New Boston Sys., Inc. v. Joffe*,
    CA936343, 1993 WL 818570 (Mass. Super. Nov. 28, 1993) ................................ 14

*Océ N. Am., Inc. v. Brazeau*,
    No. 09 C 2381, 2009 WL 6056775 (N.D. Ill. Sept. 4, 2009) ............................... 16

*Oxford Global Res., Inc. v. Guerriero*,
    No. 03-12078, 2003 WL 23112398 (D. Mass. Dec. 30, 2003) ...................... 8, 9, 13

*Pampered Chef v. Alexanian*,
    804 F. Supp. 2d 765 (N.D. Ill. 2011) ................................................................ 5

*Saban v. Caremark Rx, L.L.C.*,
    780 F. Supp. 2d 700 (N.D. Ill. 2011) ............................................................ 3, 4

*Teradyne, Inc. v. Clear Commc'ns Corp.*,
    707 F. Supp. 353 (N.D. Ill. 1989) .................................................................. 15

*U.S.A. Glas, Inc. v. Webb*,
    No. 94 C 0958, 1995 WL 59252 (N.D. Ill. Feb. 11, 1995) ............................ 15, 16

*William Gallagher Assocs. Ins. Brokers, Inc. v. Everts*,
    No.199900519C, 2001 WL 1334763 (Mass. Super. Sept. 6, 2001) ...................... 12

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................................... 3, 4

*WordWave, Inc. v. Owens*,
    No. 044758F, 2004 WL 3250472 (Mass. Super. Dec. 7, 2004) ...................... 10, 11

## STATUTES

765 ILCS 1065/1 *et seq.* ................................................................................. 15

18 U.S.C. § 1030 *et seq.* ................................................................................. 17

NOW COME Defendants Huntingdon Life Sciences, Inc. ("Huntingdon") and Nadeem Beg ("Mr. Beg") (collectively, "Defendants"), by their respective undersigned attorneys, and for their Post-Hearing Brief, to state as follows:[1]

## I.    <u>INTRODUCTION</u>

Two days of hearings on Plaintiff Charles River Laboratories, Inc.'s ("Charles River") motion for preliminary injunction have revealed that Plaintiff's motion is premised on nothing more than speculation, unfounded assumption and misrepresentation.  Charles River attempted to persuade this Court to issue broad, emergency relief in the form of a preliminary injunction against Defendants premised on Mr. Beg's downloading and emailing to himself documents from Charles River, even though the undisputed testimony revealed that (1) Mr. Beg was removed from his position as a regional salesperson by Huntingdon and has not worked since February 21, 2014; (2) Defendants have turned over all computers and devices that conceivably could contain any Charles River documents to a third-party forensic firm selected by Charles River for deletion of such documents, with Huntingdon agreeing to pay half the cost; and (3) the forensic analysis to date is consistent with Mr. Beg's testimony that after he left Charles River, he never opened or accessed a single Charles River document, and he certainly did not use or share any such documents during that time.  In addition, it is customarily industry practice not to enforce restrictive covenants like the ones at issue here, as evidenced by the fact that even Charles River has a record of not honoring such covenants.  Moreover, customers typically use four or five contract research organizations ("CROs"), such as Huntingdon and Charles River, and, therefore, Charles River's customers are not exclusive to it.

Given these facts, it follows that Charles River's dogged pursuit of a preliminary

---

[1] Defendants incorporate by reference their Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction ("Defendants' Memorandum" or "Memo."), including the authority contained therein.  Dkt. No. 30.

injunction in this case is simply an attempt to stifle fair competition by an employee who left to pursue a better opportunity.  Ultimately, Charles River failed to muster facts sufficient to demonstrate that a preliminary injunction of any kind is warranted against Defendants.

## II.    FACTUAL BACKGROUND

Huntingdon is an international contract research organization offering pre-clinical services to pharmaceutical, biopharmaceutical, crop protection and chemical companies.  *See* Declaration of David Grewcock ("Grewcock Decl.") ¶ 2, attached as Exhibit ("Ex.") A.  In late summer 2013, Huntingdon began recruiting for a salesperson through third-party recruiters.  *Id.* ¶ 3; Testimony of David Grewcock 178:5-179:7, attached as Ex. B.   Mr. Beg, an employee of Charles River, was introduced to Huntingdon by one recruiter, along with a number of other candidates.  Grewcock 178:5-179:17; Testimony of Nadeem Beg 154:1-7, attached as Ex. C.  In early December 2013, Huntingdon offered Mr. Beg the sales position of Director, Business Development, with responsibility for various states primarily in the U.S. Midwest and portions of Canada.  Declaration of Nadeem Beg ("Beg Decl.") ¶ 3, attached as Ex. D.  Mr. Beg accepted the offer and began working for Huntingdon on January 6, 2014.  *Id.*  Unbeknownst to Huntingdon, prior to Mr. Beg's resignation, he downloaded and emailed to himself certain documents, as nothing more than a security blanket, because in reality that information would not provide him or Huntingdon any competitive advantage.   Beg Decl. ¶ 4; Beg 158:24-159:7.  Huntingdon did not request that Mr. Beg bring with him any information or documents from Charles River.  Grewcock 182:9-18.  After attending orientation at Huntingdon, Mr. Beg began working, identifying existing and prospective clients for Huntingdon and contacting people in an effort to set up meetings to discuss Huntingdon's capabilities.  Grewcock 184:5-17.

On February 19, 2014, Charles River filed suit against Defendants.  *See* Complaint ("Compl."), Dkt. No. 1.  In further effort to resolve this matter, and as a demonstration of good

faith, on February 21, 2014, two days after Charles River served the Complaint, Huntingdon voluntarily removed Mr. Beg from his position, instructed him to cease performing any work and cut off access to his Huntingdon email account and its systems, and he has not worked since then. Beg Decl. ¶ 5; Grewcock Decl. ¶ 4; Grewcock 184:3-4. Additionally, Defendants voluntarily turned over all computers and devices that conceivably could contain any Charles River documents, including the Huntingdon laptop that was assigned to Mr. Beg, to a third-party forensic firm. Beg 160:12-161:20. Further, in an effort to resolve the matter, Huntingdon agreed to pay one-half of the forensics firm's fees in reviewing the devices and computers and deleting any Charles River information. Grewcock Decl. ¶ 8.

## III. ARGUMENT

### A. The Standard For Obtaining A Preliminary Injunction Is A Rigorous One, And Charles River Has Failed To Meet That Standard.

Charles River seeks broad, emergency relief against Defendants in this case, but has failed to offer evidence to support such extreme relief. "An equitable, interlocutory form of relief, a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (internal quotation omitted). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts*, 549 F.3d at 1085-86. To survive the threshold phase, a party seeking injunctive relief must demonstrate "(1) a likelihood of success on the merits; (2) a lack of adequate remedy at law; and (3) an irreparable harm will result if the injunction is not

granted." *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 705 (N.D. Ill. 2011).

"If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction." *Girl Scouts*, 549 F.3d at 1086 (citation omitted). If, however, the court finds that the moving party has passed this initial threshold, it then proceeds to the balancing phase in which "the Court must balance the threatened injury to the moving party with the threatened harm the injunctive relief may inflict on the non-moving party." *Huawei Techs. Co. v. Motorola, Inc.*, No. 11-497, 2011 WL 589697, at *2 (N.D. Ill. Feb. 10, 2011). The Court must also consider the interests of nonparties, including "the public interest." *Girl Scouts*, 549 F.3d at 1086. The Court "must exercise its discretion to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id.* (citation omitted).

After two days of hearings, Charles River has failed to present evidence supporting any of the elements entitling it to the extreme remedy of a preliminary injunction against Defendants. Accordingly, Charles River's Motion should be denied.

### B.    Charles River Failed To Demonstrate That It Has Suffered, Or Will Suffer, Irreparable Harm Without The Protection Of A Preliminary Injunction And That There Is No Adequate Remedy At Law For Any Such Injury.

#### 1.    Charles River Failed To Demonstrate Past Harm, And Cannot Demonstrate Likely Future Harm Should A Preliminary Injunction Not Be Entered.

A critical prerequisite for the extraordinary remedy of injunctive relief is that a plaintiff will suffer irreparable harm if the injunction is not granted. *Winter*, 555 U.S. at 23. An injury is not irreparable where the party seeking the temporary injunction has an adequate remedy at law and can be compensated by an award of money damages. *See Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). A party seeking an injunction must present facts which clearly establish that it is likely to suffer irreparable harm in the absence of an

inunction; a possibility of harm or mere speculation is not enough. *See Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 780 (N.D. Ill. 2011). During the preliminary injunction hearing, Charles River failed to proffer evidence that should Mr. Beg be permitted to work for Huntingdon in a sales position, or any position for that matter, he will engage in unfair competition that will result in some form of irreparable harm to Charles River.

### a. Charles River Failed To Demonstrate That Mr. Beg Usurped Any Corporate Opportunities.

Charles River appears to have taken the position that Mr. Beg may have usurped two corporate opportunities (Takeda and Sharp Packaging Systems) – neither of which was presented to Huntingdon – and as a result, Charles River potentially may have lost profits from two customers seeking bids that were not disclosed by Mr. Beg to Charles River prior to his departure. Mr. Beg testified that he did not usurp any opportunities, and he certainly did not present Huntingdon with any requests for proposal ("RFP") intended for Charles River either prior to or during his short tenure with Huntingdon. Grewcock Decl. ¶ 5; Grewcock 128:14-19; Beg Decl. ¶ 4; Beg 34:17-38:8, 157:7-158:23.

More specifically, with respect to the request for pricing by Takeda immediately before Mr. Beg went on vacation over the 2013 Christmas and New Year's holidays, Mr. Beg's undisputed testimony was that (1) Will Isom, a Charles River employee and account representative for Takeda, was included on the original email and was aware of the request; and (2) Mr. Beg had planned to follow up on the inquiry after he returned from vacation, but after he gave notice of his resignation, Charles River immediately terminated his employment, which prevented him from responding to the email. Beg 34:17-36:16; 37:1-38:8. Notably, Charles River offers no explanation for why Mr. Isom did not bother to follow up with Takeda, other than that he worked in a different group. *Id.* at 35:20-22. Nonetheless, Charles River blames

Mr. Beg for this apparent lost opportunity (one of 250,000 opportunities Charles River receives on an annual basis). Testimony of Richard Cavallaro 108:12-21, attached hereto as Ex. E.

With respect to Sharp Packaging Systems' request for testing on its film and resin, Plaintiff's Exhibit ("Pl. Ex.") 13, that Mr. Beg referred to Huntingdon, Mr. Beg's undisputed testimony was that (1) Charles River's site manager for client services, after exhaustive research, notified Mr. Beg that Charles River could not perform the requested work; (2) Sharp Packaging Systems requested a referral for a company that could do the work; (3) Charles River's site manager notified Mr. Beg that Huntingdon might be able to perform the work; and (4) at the time Mr. Beg referred Sharp Packaging Systems to Huntingdon he had not been offered employment by Huntingdon and did not know that he would be working for Huntingdon someday. Beg 157:7-158:23. This evidence is undisputed. In the end, for all of Charles River's forensics examination and mining of Mr. Beg's emails and computer activity going back months, the best it can muster are these far-fetched claims.

Further, Charles River proffered no evidence that it would have been awarded, or likely would have been awarded, any work had it responded to these requests. Indeed, Richard Cavallaro, Executive Director of Global Sales Operations for Charles River, testified that Charles River is successful on only approximately 30% to 50% of its responses to RFPs. Cavallaro 109:16-110:3. Thus, had Charles River pursued these opportunities – that is all they were – it is questionable whether it would have been awarded the work. Regardless, the undisputed fact is that neither Mr. Beg nor Huntingdon benefited in any way from these requests. Finally, even if Charles River somehow could have proffered evidence that it would have been awarded the work, any such lost opportunities – which occurred months ago – can be remedied by monetary relief; such allegations do not support a claim for prospective injunctive

6

relief of any kind, as Charles River presented no evidence of any prospective loss.

> **b.** **Charles River Failed To Demonstrate That Mr. Beg's Efforts To Prospect Existing Huntingdon Clients Has Caused, Or Will Cause, Irreparable Harm To Charles River.**

Charles River also tried to make much of emails that Mr. Beg sent to a handful of companies after he commenced employment with Huntingdon. *See* Pl. Exs. 25-30. As Mr. Grewcock testified, Mr. Beg began emailing *existing* Huntingdon customers as the new Huntingdon representative for the Midwest, and the accounts in question were assigned to Mr. Beg because they were located in his territory. Grewcock 141:24-142:18, 178:5-22, 184:5-185:19. Further, such emails are customary in the industry, regularly are sent to existing and prospective customers of Huntingdon, and none contained or referenced any information that was confidential or proprietary to Charles River. *See Id.* at 188:18-23. Thus, there is no evidence of unfair competition, let alone unfair competition that will result in irreparable harm to Charles River, sufficient to support a preliminary injunction of any kind.

> **c.** **Mr. Beg Never Accessed, Used Or Transmitted Any Confidential Charles River Information, And Neither Mr. Beg Nor Huntingdon Is In Possession Of Any Such Information.**

It is unrefuted that Huntingdon received *none* of Charles River's confidential information, and that Mr. Beg turned over all Charles River information to the forensics firm retained by Charles River. *See* Beg 160:12-161:20; Grewcock 183:22-24. After extensive forensic analysis of all devices and computers, Charles River failed to present any evidence to contradict the testimony of Mr. Beg that he never accessed, used, or transmitted any such information, and the testimony of Mr. Grewcock that Huntingdon has never received or seen any such information. Beg 47:5-14, 159:20-160:11; Grewcock 183:22-24.

Knowing this reality, Charles River can only fall back on an unspecified threat of harm and inevitable disclosure premised on what may be in Mr. Beg's head. Yet, as discussed more

fully in § III.C.3 *infra*, the doctrine of inevitable disclosure is inapplicable here. Even if there were some risk of inevitable disclosure, any alleged confidential information that Mr. Beg acquired from Charles River regarding pricing or testing and which he retained in his memory months later is without value given that when Huntingdon responds to an RFP, the other competitors typically are unknown, pricing is tailored to each proposal, and every pre-clinical laboratory proposal has unique requirements. *See* Grewcock 139:9-22, 143:11-16, 173:23-176:1, 176:21-177:9; Beg 161:17-20; Cavallaro 63:3-64:3, 64:25-65:7; 112:2-12. As such, Mr. Beg's value to Huntingdon is his credibility and general reputation in the industry and his skills as a salesperson, not any information regarding pricing or testing that he may recall from many months ago while employed by Charles River. Grewcock 131:6-10; Grewcock Decl. ¶ 7. With this complete dearth of evidence, Charles River has made no showing of irreparable harm relating in any way to any alleged confidential information.

C.    **Charles River Failed To Demonstrate A Likelihood Of Success On The Merits Of The Applicable Claims Against Defendants.**[2]

1.    **Charles River Failed To Demonstrate A Likelihood Of Success On The Merits Of Its Breach Of Contract Claim Because The Restrictive Covenants Are Unenforceable.**

To succeed on a breach of contract claim under Massachusetts law – the applicable law here – Charles River must show the existence of a valid contract, that a breach occurred, and that Charles River suffered damages as a result of the breach. *See Michelson v. Digital Fin. Servs.,* 167 F.3d 715, 720 (1st Cir. 1999). A restrictive covenant is enforceable only if it "is necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with public interest." *Oxford Global Res., Inc. v. Guerriero*, No. 03-12078, 2003 WL 23112398, at

---

[2] Consistent with Charles River's Motion for Preliminary Injunction, Memo. §§ IV(A)(1)-(4), Defendants limit their arguments to the same claims addressed by Charles River, although Defendants can establish that Charles River has failed to demonstrate a likelihood of success on the merits of its remaining legal claims as well.

*6 (D. Mass. Dec. 30, 2003). Legitimate business interests that can support a restrictive covenant under Massachusetts law include trade secrets, other confidential information, and employer goodwill. *Exeter Grp., Inc. v. Sivan*, No. 20050628BLS2, 2005 WL 1477735, at *4 (Mass. Super. Mar. 24, 2005). However, protection from "ordinary competition" is not a legitimate business interest. *Id.*

### a. The Non-Solicitation And Non-Competition Provisions Of The Agreement Are Not Enforceable Because They Are Unreasonably Overly Broad.

The non-solicitation provision contained in the Non-Disclosure, Non-Solicitation, and Non-Competition Agreement ("Agreement") is unenforceable because it is not "reasonable, based on all the circumstances." *All Stainless, Inc. v. Colby*, 308 N.E. 2d 481, 485 (Mass. 1974). Courts applying Massachusetts law routinely hold that in order to be enforced, a non-solicitation provision must be limited to those customers with whom the former employee actually had contact, as those customers are the only ones to which the former employer can claim a goodwill interest that could conceivably be infringed upon. *Garber Bros., Inc. v. Evlek*, 122 F. Supp. 2d 375, 383-84 (E.D.N.Y. 2000) (applying Massachusetts law) (finding "[t]here is relatively little danger" of a former employee appropriating a former employer's goodwill for customers with which that former employee had no relationship).

The non-solicitation provision at issue is unreasonable because it is overly broad with respect to the actual *and* potential customers of Charles River that Mr. Beg is prohibited from contacting after termination of his employment. The non-solicitation provision states that "for a period of twelve (12) months after termination of your employment with the Company . . . [an employee] shall not, directly or indirectly . . . solicit any business from or interfere with the Company's relationship with any customer of the Company . . . [to whom] (i) the Company sold goods and services, (ii) the Company had submitted a written proposal for a specific

9

requirement, or (iii) for whom the Company had work in progress." Pl. Ex. 1. As Mr. Cavallaro testified, the provision on its face prohibits Mr. Beg from working with any actual or prospective customer with whom Charles River has worked, or from which Charles River has solicited work, within the past year, regardless of whether Mr. Beg ever worked with that customer, met that customer, or bid for business from that customer. Cavallaro 115:24-118:4. Mr. Cavallaro acknowledged that the non-solicitation provision in the Agreement is not limited to customers with whom Mr. Beg actually worked; rather it applies universally to any current, former, or prospective customer of Charles River. *Id.* He further testified that the non-solicitation provision encompasses all prospective customers for which Charles River responded to an RFP or bid, regardless of whether Charles River ultimately received the business and regardless of where the customer resides. *Id.* The Agreement, and Mr. Cavallaro's testimony, demonstrate that the non-solicitation provision is overbroad, and, therefore, unenforceable under Massachusetts law.

In addition, the non-solicitation provision is unreasonable because it is not limited in geographic scope. *All Stainless, Inc.*, 308 N.E. 2d at 485. Mr. Cavallaro testified that the non-solicitation provision is not limited to the territory in which Mr. Beg actually worked, but rather applies worldwide, even limiting Mr. Beg were he to work as far away as Japan. Cavallaro 117:3-17. Again, the restrictions are overbroad and unenforceable.

Similar to the non-solicitation provision, the non-competition provision is overbroad. A non-competition provision is overbroad when it restricts a former employee from performing work for a competitor regardless of the type of work he performs for the competitor, and regardless of whether that work actually competes with the former employer, rendering it unenforceable. *WordWave, Inc. v. Owens,* No. 044758F, 2004 WL 3250472, at *4 (Mass. Super.

10

Dec. 7, 2004).  As Mr. Cavallaro testified, the non-competition clause in the Agreement does precisely that – it restricts Mr. Beg from working for any competitor in his territory, regardless of the type of work Mr. Beg performs for the competitor, regardless of whether that work actually competes with Charles River, regardless of whether Mr. Beg services existing customers of Huntingdon, and regardless of whether the customers are not exclusive to Charles River but shared with Huntingdon.  Cavallaro 106:7-112:12, 115:24-118:4.  Therefore, the non-competition provision is also unenforceable under Massachusetts law.[3]

### b.  Charles River Has Failed To Establish That The Restrictive Covenants Are Enforceable Because The Information Mr. Beg Copied Is Not Confidential.

The information that Mr. Beg copied while at Charles River is not confidential because it is available publicly and via third parties.  Determining whether information is confidential is a "factual consideration to be determined based on the conduct of the parties and the nature of the information."  *Chiswick, Inc. v. Constatas*, No. 200400311, 2004 WL 1895044, at *2 (Mass. Super. June 17, 2004).[4]  One's ability to access customer contact information "via public means does not negate confidentiality . . . .  However, information is not confidential if competitors could obtain the same information from a third party, or the information is obtainable from publicly available sources."  *Id.* at *3 (internal citations omitted).  Mr. Grewcock testified,

---

[3] Massachusetts courts, when presented with an overly broad restrictive covenant, follow "the partial enforcement approach, which reforms and enforces the restrictive covenant to the extent it is reasonable, unless the circumstances indicate bad faith or deliberate overreaching on the part of the employer." *Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463, 1469 (1st Cir. 1992) (internal citations omitted).  Here, Charles River has made it abundantly clear that the non-solicitation provision as drafted covers the entire world and prospective customers for whom it does not do any work.  Cavallaro 115:24-118:4.  Rewriting the provision would be inconsistent with Charles River's intent to limit any and all competition by former employees without limitation.

[4] Factors courts consider include "(1) the extent to which the information is known outside the business; (2) the extent to which it is know by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which information could be properly acquired or duplicated by others."  *Id.*

without dispute, that the customer and prospective customer lists that Mr. Beg downloaded from Charles River, Pl. Exs. 23-24, contained basic contact information that is generally ascertainable from a number of public and third-party sources, including, but not limited to, Evaluate Pharma, IMS, and Decision Resources. Grewcock 182:16-183:17. These are precisely the types of sources that render contact information non-confidential and insufficient to support the restrictive covenants. *See Hamburger v. Hamburger*, No. 93-3359, 1995 WL 5799679, at *2 (Mass Super. Sept. 29, 1995).

        **c.**     **Charles River Has Failed To Demonstrate That The Restrictive Covenants Are Enforceable, As They Are Not Necessary To Protect Charles River's Alleged Goodwill.**

To obtain an injunction to protect goodwill, the employer must show the existence of goodwill and that the employee being restrained is in a position to harm that goodwill. *William Gallagher Assocs. Ins. Brokers, Inc. v. Everts*, No.199900519C, 2001 WL 1334763, at *8 (Mass. Super. Sept. 6, 2001). Charles River cannot realistically claim it has a protectable goodwill interest, as it does not hold exclusive contracts with those entities Charles River claims Mr. Beg has contacted, and from which he has allegedly solicited business in breach of the Agreement. *See* Grewcock 171:16-172:19, 174:20-175:14; Beg 34:17-23; Cavallaro 106:7-107:18; s*ee also Exeter Grp., Inc.*, 2005 WL 1477735, at *5 (denying injunction; finding, in part, former employee was not soliciting a shared customer when she worked for competitor but was "simply continuing a long-term ongoing [business] relationship"). Furthermore, it is increasingly rare that CROs would have an exclusive relationship with any one customer as customers typically work with many CROs. *See* Grewcock 171:16-172:19; Cavallaro 110:4-6. Charles River failed to demonstrate that it has close relationships warranting protection with those actual customers (and certainly not prospective customers) identified on the lists downloaded by Mr. Beg.

Additionally, as to those thousands of customers with whom Mr. Beg does not have close

relationships, Charles River failed to establish that Mr. Beg is in any position to damage any good will it may have with them. *See* Grewcock 176:2-20; Beg 36:3-9, 37:15-38:8; *see also Oxford Global Res., Inc.*, 2003 WL 23112398, at * 7. Charles River's ability to produce lists of readily available customer or prospective customer information hundreds of pages long does not demonstrate that it has protectable goodwill for all companies on the list. *Id.*

        **d.**      **The Restrictive Covenants Should Not Be Enforced As They Are Against Public Interest.**

Entering a preliminary injunction to enforce the non-solicitation and non-competition provisions in this case is against the public interest. *See* Memo. n.2. The public has an interest in allowing an individual to freely practice his trade and/or occupation. *Oxford Global Res., Inc.*, 2003 WL 23112398, at *10. Mr. Beg has worked in this industry for more than sixteen years; to enjoin him from practicing his sole profession, and to deny Huntingdon one of its nine North Amciercan sales employees, would give Charles River an unfair advantage and would be against public policy. *See Chiswick, Inc.*, 2004 WL 1895044, at *4 (denying preliminary injunction; finding, if granted, defendant would "be effectively barred from working in his field of expertise," and he was the primary provider for his family). Because a preliminary injunction would conflict squarely with public policy, Charles River's motion for preliminary injunction should be denied.

It would also be inequitable to enforce this Agreement against Mr. Beg. First, Mr. Beg and Huntingdon could not anticipate enforcement of the Agreement, as restrictive covenants typically are not enforced in the industry,[5] Grewcock 172:20-173:22, 185:20-186:6, 190:8-18 and Beg 155:1-19, and it would be wholly unfair to enforce covenants of this nature against Mr.

---

[5] Plaintiffs make much of Pl. Ex. 12, Section 5 of Huntingdon's policy manual, the Employee Conduct and Security provisions, trying to elicit testimony that Huntingdon maintains a similar confidentiality provision. *See* Beg 14:1-17:2; Grewcock 190:22-191:18. Mr. Grewcock testified that this policy protects *client* confidentiality; it does not to stifle competition by former employees. Grewcock 190:22-191:18.

Beg when other sales people in the industry do not suffer this same burden. Grewcock 173:11-22. Employees frequently move to other companies, which is surely reasonable in a case like Mr. Beg's, where he was offered a significant salary increase. Grewcock 172:20-173:8, 181:19-182:8; Beg 162:4-24. More to the point, Charles River previously hired a sales and marketing executive and did not honor his non-competition agreement until ordered to do so by a court after it was discovered that he had engaged in extensive misconduct, including taking and disseminating confidential information to others at Charles River and engaging in spoliation by destroying evidence while litigation was pending. *See Harlan Labs., Inc. v. Campbell*, 900 F. Supp. 2d 99 (D. Mass. 2012); Cavalloro 119:22-123:4. Such opportunistic behavior should not be rewarded. *Cf. New Boston Sys., Inc. v. Joffe*, CA936343, 1993 WL 818570, at *3 (Mass. Super. Nov. 28, 1993) (stating "a preliminary injunction sounds in equity . . . and he who seeks equity must do equity" and denying injunction as "neither party can claim to be before this court with unsullied hands") (internal citations omitted).

2.     **Charles River Failed To Demonstrate A Likelihood Of Success On The Merits Of Its Claim That Mr. Beg Breached The Confidentiality Provision Of The Agreement.**

Charles River failed to establish a likelihood of success on its breach of contract claim premised on the confidentiality provision contained in the Agreement. Simply stated, Mr. Beg never used or disclosed any confidential Charles River information. It is unrefuted that Mr. Beg voluntarily turned over all computers and devices that conceivably could contain any Charles River documents for review and deletion of such documents, and he has retained no Charles River information. Beg 160:12-161:20. Because Mr. Beg either did not take, or has returned all of Charles River's documents, he is in no position to disclose, let alone use, Charles River's alleged trade secrets or confidential information. *See Exeter Grp., Inc.,* 2005 WL 1477735, at *5 (denying injunction; finding that although the former employee e-mailed company documents to

her personal account, "[t]here is no evidence that she did share them with her new employer"). Thus, Charles River cannot demonstrate that Mr. Beg continues to violate the confidentiality provision of his Agreement,[6] and, therefore, injunctive relief is unwarranted.

### 3. Charles River Failed To Demonstrate A Likelihood Of Success On The Merits Of Its Misappropriation Of Trade Secrets Claim.

Charles River failed to demonstrate a likelihood of success on the merits of its claim of misappropriation of trade secrets under the Illinois Trade Secret Act ("ILTSA"), 765 ILCS 1065/1 *et seq*. A party seeking the extraordinary relief of a preliminary injunction premised on a misappropriation of trade secrets claim must identify with particularity, or provide copies (redacted or filed under seal) of, the trade secrets at issue and sufficient information to support such a serious claim. *See Teradyne, Inc. v. Clear Commc'ns Corp.*, 707 F. Supp. 353, 357 (N.D. Ill. 1989). Here, Charles River only identified with any specificity two alleged trade secrets that Mr. Beg allegedly absconded with before joining Huntingdon – both of which contain customer and potential customer names and general contact information. Pl. Exs. 23-24. However, the lists in question do not constitute trade secrets, as it is unrefuted through testimony of Mr. Grewcock that the information they contain is readily available to the public through third parties such as Evaluate Pharma, IMS, and Decision Resources, and the lists do not contain any specific account details, or account pricing information. Grewcock 182:16-183:17; Cavallaro 103:1-104:8, 105:19-106:6 *see also U.S.A. Glas, Inc. v. Webb*, No. 94 C 0958, 1995 WL 59252, at *5 (N.D. Ill. Feb. 11, 1995) ("Customer information is not protectible [*sic*] where it has not been

---

[6] Charles River introduced two PowerPoint presentations from November 20, 2013, in an attempt to demonstrate its unfounded and erroneous belief that Mr. Beg had violated the confidentiality provisions of the Agreement by working for Huntingdon prior to leaving Charles River. Pl. Exs. 14-15. To the contrary, both Mr. Beg and Mr. Grewcock testified that these presentations were merely a tool Mr. Grewcock regularly used to evaluate possible candidates during the interview process. Grewcock 129:12-130:25, 180:6-181:3; Beg 27:10-17. The presentations do not contain any confidential information or reflect that Mr. Beg was working for Huntingdon. Grewcock 129:12-130:25, 180:6-181:3.

treated as confidential and secret by the employer, was generally available to other employees and known by persons in the trade, could easily be duplicated by reference to telephone directories or industry publications, and when the customers on such lists did business with more than one company.") (internal citations omitted).

For the sake of argument, even if Mr. Beg had downloaded documents or information from Charles River that constituted a trade secret, at no point during the hearing did Charles River identify a single instance in which Mr. Beg *used* or *disclosed* any alleged Charles River information after leaving Charles River. On the contrary, it is unrefuted that Huntingdon never saw or received any of Charles River's alleged confidential information, and that Mr. Beg never accessed or shared the files he downloaded from Charles River. Beg 46:18-47:14, 160:2-11, 161:14-20; Cavallaro 92:19-22.

Furthermore, as discussed more fully in Defendants' Memorandum, the inevitable disclosure doctrine on which Charles River necessarily premises its argument[7] was not intended to be applied to rank and file sales employees like Mr. Beg that possess no proprietary information. *See* Memo. 10-11. The case law addressing the doctrine of inevitable disclosure reinforces sound public policy that the law is hostile toward restrictions on trade and commerce. *See Océ N. Am., Inc. v. Brazeau*, No. 09 C 2381, 2009 WL 6056775, at *10 (N.D. Ill. Sept. 4, 2009). Based on the lack of facts supporting a claim for inevitable disclosure, Charles River cannot succeed on its misappropriation of trade secrets claim, and, therefore, a preliminary injunction is unwarranted.

---

[7] As discussed *supra* § II, Huntingdon and Mr. Beg have turned over all computers and devices that conceivably could contain any Charles River documents for review and deletion of all such documents. As such, Charles River cannot plausibly argue that Mr. Beg is still in possession of any of Charles River's documents.

4. **Charles River Cannot Style The Copying Of Information As A Violation Of The Computer Fraud And Abuse Act, And Such Claim Does Not Support Injunctive Relief.**

Charles River's claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* ("CFAA") is essentially predicated on Mr. Beg's accessing Charles River's computer database while an employee and then attempting to delete local *copies* of the information exported from that database from his Charles River computer. Compl. ¶¶ 77-78. Accessing a computer database or misappropriating information is insufficient to establish CFAA damages; rather, the CFAA demands that "there must be destruction or impairment to the integrity of the *underlying data.*" *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F. Supp. 2d 805, 811 (N.D. Ill. 2009) (emphasis added).

While Charles River alleges that Mr. Beg attempted to delete documents from his Charles River computer, Compl. ¶¶ 33-37, at no point did Charles River present evidence that Mr. Beg tried to delete the *underlying data*. Beg 159:20-160:1. Nor did Charles River present any evidence that there has been any disturbance in the integrity of Charles River's underlying data as a result of Mr. Beg's alleged conduct. Finally, as discussed more fully in Defendants' Memorandum, Charles River cannot style its allegations concerning its investigation and forensic damages assessment into the definition of a CFAA "loss." Memo. 12-13. Thus, Charles River cannot establish a likelihood of success on the merits of its CFAA claim. Further, even if Charles River somehow could muster facts to support a CFAA claim, there is no allegation of any ongoing violation or irreparable harm sufficient to warrant injunctive relief premised on this claim.

5. **Huntingdon Has Not Tortiously Interfered With A Valid Contract.**

To succeed on a claim for tortious interference under Illinois law, Charles River must allege "(1) the existence of a valid and enforceable contract between the plaintiff and another;

17

(2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012), *reh'g denied*, Mar. 19, 2012 (internal citations omitted). Charles River has not demonstrated a likelihood of succeeding on the merits of its tortious interference claim. First, Charles River's tortious interference claim fails because, as discussed *supra* § III.C.1, Charles River failed to establish that Huntingdon intentionally and unjustifiably induced Mr. Beg to breach a valid agreement because the restrictive covenants at issue are unenforceable. *See Hess*, 668 F.3d at 454. Second, as to the confidentiality provision of the Agreement, Huntingdon never requested that Mr. Beg bring with him to Huntingdon any information or documents from Charles River, nor did Huntingdon encourage Mr. Beg to disclose Charles River's allegedly confidential information. *See* Grewcock 182:9-18, 183:18-24; Grewcock Decl. ¶ 6; Beg Decl. ¶ 4. And, critically, Mr. Beg never did so. *See* Grewcock 183:22-24; Beg 160:2-11; Grewcock Decl. ¶ 6; Beg Decl. ¶ 4. Third, as Mr. Grewcock and Mr. Beg both testified, neither Huntingdon nor Mr. Beg used any Charles River confidential information in any way. Grewcock 128:14-19; 182:9-18, 183:18-24; *see also* Grewcock Decl. ¶¶ 5, 6; Beg Decl. ¶¶ 4, 7. This is not a case in which Huntingdon tried to poach Mr. Beg from Charles River in order to induce him to breach his contract. Therefore, Charles River has not demonstrated a likelihood of success on its tortious interference claim against Huntingdon (the sole claim against Huntingdon), and injunctive relief is unwarranted.

### D.  A Balancing Of Harms Compels Denial Of Charles River's Motion.

In order to grant injunctive relief, the Court must find that the threatened injury to the plaintiff outweighs the harm the injunction may inflict on the defendant, and that the injunction will not disserve the public interest. *See McDermott Inc. v. Wheelabrator-Frye, Inc.*, 649 F.2d

489, 492 (7th Cir. 1980). Charles River's harm if Mr. Beg – a rank and file salesperson – were to continue working at Huntingdon would be negligible at best, given that Charles River does exponentially more business than Huntingdon and Mr. Beg can only engage in fair competition. *Compare* Cavallaro 108:12-21 (approximately 250,000 RFPs globally last year) *with* Grewcock: 177:10-178:4 (approximately 5,300 RFPs globally last year). In the end, Charles River failed to present any evidence that it is suffering, or will suffer, any irreparable harm from Mr. Beg's working for Huntingdon as a salesperson. Nor has Charles River offered evidence of any unfair advantage Huntingdon will have over it absent an injunction.

On the other hand, if the Court were to grant the requested injunctive relief, it would have devastating financial consequences for Mr. Beg. Beg 146:2-147:17; 156:17-20, 162:25-163:7. Mr. Beg is not a highly compensated executive, but a sales employee who is the primary wage earner for his family, which includes four children. *See* Beg 145:15-146:8. Understandably, Mr. Beg must work to provide for his family, and granting Charles River's preliminary injunction would effectively prohibit him from working in the only industry he has known for well over a decade.[8] Beg 6:1-8, 146:2-147:17; *see also Chiswick, Inc.*, 2004 WL 1895044, at *4. While Mr. Cavallaro speculated that Mr. Beg should be able to find another sales job, Cavallaro 85:14-86:1, there is no evidence that Mr. Beg's skills are transferrable to another industry, that he is qualified for sales positions in a field other than that in which he has worked for decades, or that he could earn nearly as much as he has in the one field he knows. *See* Beg 147:2-17. In addition, if the preliminary injunction were granted, Huntingdon would lose a critical sales person and be at risk of neglecting its current and prospective customers, while also unduly burdening Huntingdon's few remaining sales people who would have to cover the Midwest

---

[8] During the weeks that Mr. Beg worked for Huntingdon, he accomplished little, and he has not worked since February 21, 2014. *See* § II, *supra*. Thus, Charles River effectively has had the benefit of a nearly four-month non-compete period.

region as well as their own territories. Grewcock 191:19-192:8. *See Applied Indus. Materials Corp. v. Brantjes*, 891 F. Supp. 432, 439 (N.D. Ill. 1994) ("injunction should not go beyond the need to protect the legitimate interests of the plaintiff and should not unduly burden the defendant"). Furthermore, Huntingdon would be forced to undertake its job search – most likely utilizing one or more costly recruiting firms – all over again. Grewcock 191:19-192:8.

Finally, the public interest warrants denial of injunctive relief in this case given that an injunction would have a chilling effect on the movement of employees, regardless of whether they are subject to enforceable restrictive covenants. Additionally, given that Charles River's business is exponentially larger than Huntingdon's, injunctive relief would unnecessarily stifle Huntingdon's business and discourage smaller companies from trying to compete with their larger competitors. Therefore, Charles River's request for a preliminary injunction should be denied.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiff's Motion for Preliminary Injunction and grant Defendants any and all appropriate relief.

April 25, 2014                            Respectfully submitted,

/s/ Katherine E. Kenny
Thomas F. Hurka
Katherine E. Kenny
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Sixth Floor
Chicago, Illinois 60601
Telephone:  (312) 324-1000
Facsimile:  (312) 324-1001
thurka@morganlewis.com
kkenny@morganlewis.com
*Attorneys for Defendant Huntingdon Life Sciences, Inc.*

/s/ Zachary C. Jackson
Zachary C. Jackson
EPSTEIN BECKER & GREEN, P.C.
150 North Michigan Avenue, 35th Floor

Chicago, Illinois 60601
Telephone:  (312) 499-1462
Facsimile:  (312) 827-9562
zjackson@ebglaw.com
*Attorney for Defendant Nadeem Beg*

## CERTIFICATE OF SERVICE

I, Katherine E. Kenny, hereby state that on April 25, 2014, I filed a true and correct copy of the above and foregoing via the Clerk's CM/ECF system, which caused a copy of the same to be served upon the following counsel of record for Plaintiff:

Peter R. Bulmer
JACKSON LEWIS P.C.
150 North Michigan Avenue, Suite 2500
Chicago, Illinois 60601

Conrad S. Kee
JACKSON LEWIS P.C.
1010 Washington Boulevard, 7th Floor
Stamford, Connecticut 06901

*Attorneys for Plaintiff Charles River Laboratories, Inc.*

/s/ Katherine E. Kenny
Katherine E. Kenny